John R. PATTERSON et al.,
Plaintiffs,

v.

NEWSPAPER AND MAIL DELIVER-
ERS' UNION OF NEW YORK AND
VICINITY et al., Defendants.

EQUAL EMPLOYMENT OPPORTUN-
ITY COMMISSION, Plaintiff,

v.

NEWSPAPER AND MAIL DELIVER-
ERS' UNION OF NEW YORK AND
VICINITY et al., Defendants,

James Larkin et al., Intervenors.

Nos. 73 Civ. 3058 and 73 Civ. 4278.

United States District Court,
S. D. New York.

Sept. 19, 1974.

Supplemental Opinion Oct. 11, 1974.

Paul J. Curran, U. S. Atty., for the Southern District of New York by Michael Devorkin, Asst. U. S. Atty., for plaintiff Equal Employment Opportunity Commission.

Jack Greenberg, Deborah M. Greenberg, New York City, Willkie Farr & Gallagher, by Michael Targoff, New York City, for private plaintiffs.

O'Donnell & Schwartz by Asher W. Schwartz, New York City, for defendant Newspaper and Mail Deliverers' Union of New York and Vicinity.

Townley, Updike, Carter & Rodgers by John D. Canoni, New York City, for defendant New York Daily News.

John J. Stanton, Jr., New York City, for defendant New York Times.

Sidney Orenstein, New York City, for defendant New York Post.

Sabin, Bermant & Blau by Bruce H. Berry, New York City, for defendants Long Island Press Publishing Co. and Evening Journal Assoc., and Newark Morning Ledger Co.

Bandler & Kass by Julius Kass, Robert Sylvor, New York City, for defendants Bay City News Co., Brodsky News, Inc., Crescent News Distributors Inc., Flushing News Co., Gaynor News Co., Hackensack News Co., Hudson County News Co., Jersey Coast News Co., Long Island News Corp., Newark Newsdealers Supply Co., New Brunswick Newsdealers Co., Passaic County News Co., S. Rachles Newsdealers, Rockland Newsdealers, Standard News Co., Union County Newsdealers Supply Co., Boro Park News Co. and Merit News Co., Inc.

Rosenman, Colin, Kaye, Petschek, Freund & Emil by Joseph Zuckerman, New York City, for defendants Bronx County News Co., Kings County Delivery, Lang News Co., Metropolitan News Co., Weinberg News Co., Woodhaven News Agency, Brownsville News Co., Inc. and Ridgewood News Co.

Wilfred L. Davis and Stephen Davis by Stephen Davis, New York City, for defendants Brooklyn News Co., Imperial News Co., and T & T News Co.

Stroock & Stroock & Lavan by Lawrence M. Handelsman, New York City, for defendant Amsterdam News Co.

Patterson, Belknap & Webb by Marguerite B. Filson, New York City, for defendant Dow Jones & Co., Inc.

Satterlee & Stephens by Wendy K. Mariner, Henry J. Formon, Jr., New York City, for defendant Fairchild Publications, Inc.

J. Donald Higgins, Floral Park, N. Y. for East Island News Co.

Fine, Tofel & Saxl by Sherman J. Saxl, New York City, for defendant El Diario Publishing Co.

Sidney A. Florea, New York City, for defendant Manhattan News Co., Inc.

Ashe & Rifkin by David I. Ashe, New York City, for Jewish Daily Forward.

Herman H. Tarnow, New York City, for intervenors.

## MEMORANDUM OPINION AND ORDER

PIERCE, District Judge.

This memorandum approves a settlement reached by all of the parties after a four-week trial on the merits of two consolidated actions charging employment discrimination in the newspaper and publications delivery industry in the New York City area. The provisions of the agreement are intended to achieve a 25% minority [1] employment

---

1. "Minority" as it is used in this Settlement Agreement refers to the definition of that word by the Equal Employment Opportunities Commission, and means people who are Black, Spanish-surnamed, Oriental and American Indian.

goal in the industry within five years. At the present time, minority employment in the industry is less than 2%; the comparable percentage of minorities in the relevant labor force in the New York City area is approximately 30%. The agreement also provides for supervision of hiring practices and employment opportunities in the industry to the benefit of both minority and non-minority workers.

One of the actions has been brought by the Equal Employment Opportunity Commission (EEOC) and names as defendants the Newspaper and Mail Deliverers Union of New York and Vicinity (the Union), the New York Times (Times), the New York Daily News (News), the New York Post (Post) and some fifty other publishers and news distributors within the Union's jurisdiction. The other action is a private class action on behalf of minority persons. Both actions charge that the Union, with the acquiescence of the publishers and distributors, has historically discriminated against minorities; and that the present structure of the collective bargaining agreement, combined with nepotism and cronyism and other abuses in employment and referral practices, have perpetuated the effects of the past discrimination, in violation of 42 U.S.C. § 2000e et seq. (Title VII). Each lawsuit sought an affirmative action program designed to achieve for minorities the status they would have had in this industry but for the alleged discriminatory practices.

Both actions were filed in 1973. After months of negotiation, the parties reached a settlement agreement in early 1974, but it was rejected by vote of the Union's membership. Following another abortive attempt to obtain ratification from the membership, the two actions were consolidated with each other for a hearing on motions for preliminary relief before this Court. The hearing commenced May 14, 1974. At its conclusion on June 12, 1974, the Court ordered the hearing consolidated with trial on the merits, pursuant to Fed.R.Civ.P. 65(a)(2), giving the parties the opportunity to present further evidentiary submissions or testimony. No further evidence was presented. Instead, the parties having once again entered into settlement discussions, brought before this Court for approval a Settlement Agreement dated June 27, 1974, entered into by all the plaintiffs and all the defendants, and ratified by the Union membership.

A hearing on the fairness, adequacy and reasonableness of the Settlement with respect to the plaintiffs' class was held on August 27, 1974, after due notice to that class. On the same date the Court also held a separate hearing on the legality of the relief provided in the Settlement and its impact on a group of non-minority workers who had, prior to trial, been permitted to intervene in the consolidated actions for the purpose of challenging any affirmative relief which might have affected their interests.

### The Standards

■■ As a general proposition, when a settlement agreement is presented to the Court for approval, the Court's role is limited to the exercise of its equitable powers. The Court is not to substitute its judgment for that of the parties. See, e. g., Glicken v. Bradford, 35 F.R.D. 144, 151 (S.D.N.Y.1964); United States v. Carter Products, Inc., 211 F.Supp. 144, 148 (S.D.N.Y.1962). Instead, its role is to assure that the settlement is fair to the class and the parties, and represents a reasonable resolution of the dispute. See, e. g., State of West Virginia v. Chas. Pfizer & Co., 314 F.Supp. 710 (S.D.N.Y.1970), aff'd, 440 F.2d 1079 (2d Cir.), cert. denied, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). Ordinarily, the Court is not expected to examine conclusively into the underlying facts or legal merits of the action. See, e. g., Newman v. Stein, 464 F.2d 689, 691–693 (2d Cir.), cert. denied, 409 U.S. 1039, 93 S.Ct.

521, 34 L.Ed.2d 488 (1972); United States v. Carter Products, Inc., *supra*, 211 F.Supp. at 148.

■ But, this is not an ordinary case. It must be recognized that efforts to correct discrimination affect the strongest public sensitivities. The interests involved are far broader than those of the particular parties in a particular lawsuit. Therefore, the parties cannot be permitted to settle for less than, or for more than, the facts of the case and public policy expressed in Title VII mandate. Thus, although the Court is of the opinion that even at this late stage public policy is served by an agreement rather than an adjudication, a more searching discussion of the merits is warranted. In fact, the state of the law in this Circuit may require certain findings of fact to support affirmative action in a Title VII case even when it is resolved by settlement. See, Rios v. Enterprise Association Steamfitters Local 638, 501 F.2d 622, 628, n. 4 (2d Cir., 1974), explaining United States v. Wood, Wire and Metal Lathers International Union, 471 F.2d 408 (2d Cir. 1973), cert. denied, 412 U.S. 939, 93 S. Ct. 2773, 37 L.Ed.2d 398 (1973). Further, a more conclusive examination of the merits is necessary in this case because the affirmative action program and the minority goal in principle, and the 25% minority goal, are all vigorously disputed by the intervenors.

Inasmuch as this Court has heard a four-week completed trial in these actions, it is in a unique position to find facts and to set forth conclusions of law. Therefore, what follows shall constitute this Court's findings and conclusions to the extent that they form the necessary legal support for the affirmative action proposed.

### The Background

Most of the facts are not contested. The Union is the exclusive bargaining agent for a collective bargaining unit encompassing the work performed in the delivery departments of newspaper and publication distributors in the New York area. Its geographic jurisdiction has been variously stated, but it is fair to define it by where the employers in the industry are located: in the metropolitan area of New York City (within a fifty mile radius of Columbus Circle), the New York counties of Nassau and Suffolk, the New Jersey counties of Bergen, Essex, Hudson, Middlesex, Monmouth, Passaic and Union, and the Connecticut county of Fairfield.

The nature of the delivery industry is such that the employers' needs for delivery department employees vary from day to day, and indeed, shift to shift, depending upon the size and quantity of the publication(s) being distributed. Thus, each employer by the terms of the Union contract, maintains a regular work force (Regular Situation holders) for its minimum needs, and depends upon daily shapers to supplement the force. By the terms of the contract, at the major employers the shapers are categorized into groups with descending daily hiring priorities. The Group I list of shapers is restricted, by contract, to persons who have at one time held a Regular Situation in the industry. They have first shaping priority at every shift, in order of their shop seniority. After the Group I is exhausted at any given shift, the contract provides that the next hiring priority shall go to Group II members. Group II consists of all persons in Group I and all persons holding Regular Situations in the industry. Once all of the Group II members who have appeared for the shape are put to work, the contract provides that the remaining open jobs, if any, will go to Group III members who have appeared for the shape, in order of their shop tenure.

The shaping system is considerably less structured for the smaller publications and distributors, and, in fact at this time, only the News and the Times maintain Group III lists of any significant size.

All of the jobs in the industry are within the Union's jurisdiction, whether performed by Regular Situation holders

or by any of the members of the various groups, or any one who shapes at all. The jobs are essentially the same, regardless of the status of the worker who fills them, and are all relatively unskilled. Most workers drive trucks or do floor work. However, because the contract provides that a Regular Situation is a prerequisite to Union membership, only Regular Situation holders and members of Groups I and II are Union members.

In theory at least, in addition to structuring the daily hiring priorities, the Group system also represents the priority list for filling Regular Situations as they may become vacant in the newspapers shops.

The Union was founded in 1901, long before the present Group structured contract was in existence. There is no evidence to indicate that at that time it had any minority members (as that term is defined today). Historically it virtually limited membership to the first born legitimate son of a member. The industry had a closed shop and Union members were consistently hired before non-Union men at all industry shapes. In 1952, the industry adopted the contract which included the rudiments of the Group structure described above.

■■■ It is abundantly clear that the nepotistic policy of the Union prior to 1952 resulted in *discrimination against minorities.* See, e. g., Rios v. Enterprise Association Steamfitters Local 638, *supra,* 501 F.2d 622; United States v. Wood, Wire and Metal Lathers International Union, 328 F.Supp. 429, 432 (S.D.N.Y.1971). The fact that the Union's intent was not to discriminate against minorities, but to prefer Union members and their sons, does not change the basic conclusion. The effect of such policies, deliberate or not, was to foreclose minorities from employment in the industry. It is the discriminatory *effect* of practices and policies, not the under-

lying intent, which is relevant in a Title VII action.

The Group structure, instituted in 1952, appears on its face to discard these discriminatory policies and to open up regular employment opportunities and Union membership to the entire labor force. But, there is uncontroverted evidence that certain relevant provisions of the contract have been administered haphazardly, and that the Group structure has been circumvented by friends and family of Union members. In practice, the fact is that no non-Union Group III shaper in the industry has achieved a Regular Situation, and thus Union membership, by moving up the Group system since 1963.

Testifying at trial, the Union president credibly asserted that the Union was not motivated by any intent to discriminate against minorities, but went on to say that, "I would be the first to admit that we favor and we are partial to our members and I'm not ashamed of that." This attitude is, of course, admirable under most circumstances. There would be nothing unlawful about its effect under Title VII providing that minorities, historically, had been provided free and equal access to Union membership. But the facts indicate that such is not the case here. And even without evidence of abuse of the Group system, the statistics alone reveal the present situation.

There are presently some 4,200 members of the Union, including some 900 pensioners. More than 99.% of these Union members are White (non-minority).

There are, at present, a total of 2,855 persons actively working in the industry—this includes Regular Situation holders (2,460), Group I members (123), and Group III members (272).[2] Of the total in these categories, 70 persons—2%—are Black, Spanish-surnamed, Oriental or American Indian. Of

---

2. Group II is not counted here because Group II is constituted of persons who also hold Regular Situations or Group I positions in the industry. They are permitted by the contract to shape in any shop other than their own, in addition to their regular jobs.

the 70 minority persons, 28 are scattered among the smaller publishers and distributors; 24 work at the News where the force is approximately 900; work at the Times where the force is approximately 400; and 1 works at the Post where the force is approximately 318.

These figures demonstrate that 20 years after the industry instituted a neutral Group structure of employment and hiring priorities, the participation of minorities in this industry is still grossly disproportionate to the percentage of minority workers in the relevant labor force, which the EEOC suggests is approximately 30%.[3] Even allowing for the fact that the industry has seen many newspapers disappear in these last two decades, with a concomitant loss of jobs, the clear inference from these statistics is that abuses of the Group structure and indeed the Group structure itself, is serving—however unintentionally—to "lock-in" minorities at the non-Union entry level of the industry, and to thereby perpetuate the impact of past discrimination on the minorities with whom these Title VII actions are concerned. It is this present impact of past practices which justifies the affirmative, corrective relief embodied in the Settlement Agreement. See, Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Rios v. Enterprise Association Steamfitters Local 638, *supra;* United States v. Wood, Wire and Metal Lathers International Union, *supra;* United States v. Bethlehem Steel Corp., 446 F.2d 652 (2d Cir. 1971).

### The Terms of the Agreement

As with many resolutions of employment discrimination cases, · the Settlement Agreement in these actions contains general provisions permanently enjoining the defendants from discriminatory practices in violation of Title VII. And, like the judgment in *Rios*, 360

F.Supp. 979 (S.D.N.Y.1973) and the agreement in *Wood, Wire* (68 Civ. 2116, S.D.N.Y., Feb. 25, 1970), this Settlement Agreement sets forth a minority employment goal. In this case, it is for 25% minority employment in the industry within five years.[4] But, unlike *Rios* and *Wood, Wire,* this Settlement Agreement does not merely commit the parties to the future development of a plan to achieve that goal. Instead, it sets forth a plan with great specificity, including variations on the general theme to account for varying circumstances between different employers. Such detail indicates that the plan is the result of hard, serious and good faith negotiations, and that the different pressures, perspectives and interests of the parties have been confronted and already resolved. This serves to increase the Court's confidence that the plan is workable, and can be implemented immediately.

The plan is built upon the outline of the present Group priority structure of the collective bargaining agreement. It provides for an administrator whose duties include not only close supervision of the plan, but also of employment opportunities in the industry on behalf of all workers. Its major features include elimination of past abuses of the Group system; elimination of the contract provision which restricted Group I to former Regular Situation holders; provision for an orderly flow of Group III shapers—alternating one minority person with one non-minority person— into steady and secure employment in the industry, first as members of Group I and from there, as Regular Situations become vacant, to Regular Situations. Union membership will be offered to each Group III worker as he reaches the bottom of Group I. The plan further provides that until the 25% minority employment goal is achieved, em-

---

3. See p. 593.

4. The parties have defined "employment" as encompassing Regular Situations and Group I positions. Their view is that a place in either of these two groups represents a steady, secure job in the industry. The Court agrees, at this time. The definition is subject to revision by terms of the Settlement Agreement.

ployers shall hire, at the entry level, three minority persons for every two non-minority persons. In addition, minorities who are presently active on Group III at the News and the Times will immediately move to the bottom of the Group I list, with an equal number of non-minorities to immediately follow them onto the Group I list. These minorities will be given pension benefits they would have earned but for the disadvantages they have encountered. With the same purpose, funds have been established by the defendants to provide back pay awards chiefly to these persons.

### The Intervenors' Objections

The Group III list at the News numbers 178. Scattered throughout the list, in terms of tenure, are 13 minority persons. The intervenors purport to speak for the other 165 persons on the list, and more broadly for all non-minority, non-Union workers in the industry.

Most of the provisions of the Settlement Agreement are applauded by the intervenors, as well they might be. By regulating employment opportunities in the industry, unlocking Group III and Group I, Regular Situations and Union membership, the Agreement will operate beneficially for the intervenors as well as for the minorities.

The focus of their objection is on the order of the flow from Group III to Group I. They assert that the flow ought to be in strict order of tenure on Group III. To immediately move all of the present Group III minorities to the Group I list ahead of some non-minorities who have been listed for a longer period of time on Group III, they assert, is to engage in "leap-frogging" not intended by Title VII. Further, they argue, that the system becomes even more onerous when the provisions for alternating minority/non-minority elevation to Group I go into effect, because after the few minorities who have any tenure in the shop are moved to Group I, the employer will be required to move minorities with no tenure at all ahead of some present Group III non-minorities.

The facts selected by the intervenors in support of their objections are so. And, at first glance their frustration and anger with this Settlement Agreement is understandable, and their solution is appealing. These intervenors from Group III, as individuals, have also suffered the effects of the Union's nepotism; they have also attacked the present practices and abuses in other forums, under different statutes. Certainly this Court does not accept the argument that these particular men have benefited from a discriminatory system.

But, on deeper examination of the Settlement Agreement and the intervenors' objections, there are a number of reasons why this Court does not, and indeed can not, view the intervenors as raising countervailing considerations of such a substantial nature as to preclude approval of the plan.

First and dispositive of all the issues raised by the intervenors, the Settlement Agreement simply does not trample on their employment opportunities. In the long run, it must be acknowledged by all concerned that the effect of this Agreement, if it operates as predicted, will be to achieve Regular Situation or Group I status for *all* members of Group III, minority and non-minority alike, within a relatively short time-span. Without this Settlement, Group III workers had little if any hope of ever achieving either status under the present system. The intervenors do not contend otherwise. Instead, their objections deal in the main with interim measures which do, in fact, move some minorities faster than some non-minorities. But it must be noted that once a Group III non-minority is elevated to Group I, his daily shaping opportunities will be no less than they presently are and indeed they may be greater. The News projections submitted to this Court indicate that within a month after implementation of the plan, the non-

minority who is number 47 on the Group III list, and all non-minorities above him, will have been elevated to Group I. The progression thereafter is expected to be approximately 27 non-minority persons to Group I each year. Also the Settlement Agreement provides other benefits to Group III non-minorities, not the least of which is the appointment of an administrator who is empowered to assure that existing work opportunities in the industry shall be made available to any Group III person unable to get at least 45 shifts of work in any calendar quarter.

Further, even if the Settlement Agreement did not provide non-minorities with these benefits, the intervenors' position is not factually or legally sound. Their premise is that the Settlement Agreement will oust them from what they perceive as vested seniority rights in their Group III order. If, in fact, this Settlement Agreement affected firm and realistic seniority rights and expectation of innocent non-minority workers, there could be doubts as to the validity of the relief afforded. See e. g., United States v. Bethlehem Steel Corp., *supra*, 446 F.2d at 661. But in this case, regardless of the priority structure of the present contract, and the language which may be used in it, the fact remains that Group III workers do not have full-time employment, nor do many of them have any great expectations or intention of working full-time while they shape from the Group III list. They are shapers. And, to the extent that the present contract structure, in theory, gives them certain priorities, by tenure on Group III, to achieve Regular Situations, the facts have demonstrated that they could not have any realistic expectation of such movement actually occurring. As noted above, no Group III worker has moved up the list to a Regular Situation since 1963.

Their expectations with respect to daily shape priorities must be viewed in a somewhat different light. When an additional person is placed in front of a shaper, theoretically his chances of working any particular shift are decreased by a factor of one job. This, of course, depends on the stability of the total number of jobs available from shift to shift and whether or not the new person chooses to shape the same shift. In other words, assessing a shaper's expectation is a highly speculative exercise. The Court does not mean to minimize a Group III member's vested emotional interest in his position at a shape, but it cannot be equated with the worker who might be "bumped" from a steady and seemingly secure position by an outside minority with less seniority than him. Further, it must be pointed out that even if these shaping priorities were viewed as providing firm expectations, "[such] seniority advantages are not indefeasibly vested rights but mere expectations derived from a bargaining agreement subject to modification." United States v. Bethlehem Steel Corp., *supra*, 446 F.2d at 663. Indeed, the intervenors themselves recognize this principle when they approve of many changes made in the collective bargaining agreement by the proposed Settlement.

Also, it must be said that the relief the intervenors suggest, which would observe strict tenure of the Group III list, would most likely not provide the relief mandated by Title VII for minorities. Given the fact that the active work force at the News numbers 900 and includes only 24 minority persons, it would clearly take a far longer period of time to reach a goal of 25% minority employment. Because the minority percentage is so low, the same objection holds true if, as the intervenors have suggested, the Group I and Group III lists were dovetailed by shop tenure.

■■ Finally, it must not be forgotten that this is a Title VII case. Such cases, as Judge Frankel has said in *Wood, Wire* are "launched by statutory commands, rooted in deep constitutional purposes, to attack the scourge of racial discrimination in employment. . . . [a]nd we know that, in addition to the spiritual wounds it inflicts,

such discrimination has caused manifold economic injuries, including drastically higher rates of unemployment and privation among racial minority groups." United States v. Wood, Wire and Metal Lathers International Union, Local Union 46, 341 F.Supp. 694, 699 (S.D.N.Y. 1972). Title VII is an expression of a commitment to correct *minority* employment discrimination and, hopefully, the vast social consequences that flow from it and afflict the whole of the nation. The statute does not undertake to correct *all* forms of employment discrimination. Thus, to the extent that what the intervenors seek here is relief equal to that afforded minorities, it has no legal foundation, in this case. Under the law, relief here must be limited to victims of the kind of discrimination prohibited by Title VII. United States v. Bethlehem Steel Corp., *supra*, 446 F.2d at 665. There is no evidence and no assertion that the intervenors have been discriminated against on account of race, religion, color, sex, national origin, or because they have made charges, testified, assisted or participated in any enforcement proceedings under Title VII.

### The 25% Minority Employment Goal

There remains the requirement of Rios v. Enterprise Association Steamfitters Local 638, *supra*, 502 F.2d 622, for reliable factual support for the 25% goal. All of the parties have agreed to the figure. The EEOC has based its conclusion on relevant labor force statistics contained in the tables published by the United States Department of Commerce in a publication entitled *General Social and Economic Characteristics, 1970 Census of Population, for the* relevant geographic areas of the Union's jurisdiction. Using what this Court agrees is the most reliable profile possible of the candidate for deliverers' work, the EEOC has extracted figures for Black males over 16 years of age with a high school diploma or less. With considerable ingenuity, the agency has also extrapolated comparable figures for minorities other than Black. Added

together they indicate that the relevant labor force is 30% minority. Although the private plaintiffs and the intervenors have submitted other calculations and bases with respect to minority representation in the relevant labor force, in this Court's view the EEOC analysis is the soundest and provides ample support for the 25% minority goal included in the Settlement Agreement.

### Conclusion

■ This Court has found that the affirmative relief provided in the Settlement Agreement is justified by the facts of this case. It has found that the 25% minority goal is supported by reliable statistics. It has found that the affirmative relief provides members of the plaintiffs' class and other minorities with an adequate, fair and reasonable route to their "rightful place" in this industry, and that the Settlement Agreement is enforceable, legal and in the public interest. The Court has also found that the Settlement Agreement does not so interfere with the rights of the intervenors as to require disapproval.

Therefore, the motion of the parties for approval of the Settlement Agreement is hereby granted. Settle Order, upon the consent of the parties, endorsed thereon by their attorneys, accordingly. So ordered.

### SUPPLEMENTAL OPINION and ORDER

On September 19, 1974 this Court filed a Memorandum Opinion and Order approving the proposed settlement of these actions. As part of that settlement the parties agreed to the appointment of an Administrator to supervise its implementation. While they agreed that the Court would appoint a person of its own choosing, they indicated a preference for a particular individual whose reputation as an experienced person in labor-management relations is undisputed.

■ This Court is mindful that given the context of a suit pursuant

to Title VII of the Civil Rights Act of 1964 experience in labor-management relations is not without significant value to an Administrator. But this is not to say that under all circumstances an Administrator in a Title VII action must be recruited from the ranks of the labor-management specialists. There are instances, and the Court believes this to be one of them, when other qualities may assume greater importance in meeting the commitment to the broad social policies which underpin the 1964 Act.

The Administrator appointed in these consolidated actions will be charged with the responsibility of seeing that the terms of the Settlement Agreement under Title VII of the Civil Rights Act of 1964 are diligently and conscientiously implemented. This Act was designed primarily to protect, and provide a more effective means to enforce, the civil rights of persons within the jurisdiction of the United States. It aims, inter alia, to eliminate discriminatory practices by businesses, labor unions, or employment agencies and thereby to encourage the growth of economic opportunities for minority individuals, thus strengthening the economic foundation essential to the full enjoyment of civil rights. When President Lyndon B. Johnson signed the 1964 Act, he declared that its overriding social goal was "to promote a more abiding commitment to freedom, a more constant pursuit of justice and a deeper respect for human dignity."

In light of these broad national purposes, this Court considers it of paramount importance that the Administrator it appoints here possess a finely tuned sensitivity to the social impact of past discriminatory employment practices, and a balanced sense of dedication and commitment to the elimination of these practices.

Further, while in some cases the very nature of the industry in which the Settlement Agreement is to operate and the unusual complexity of its labor-management problems may dictate the appointment of an individual with a background in labor-management relations, such is not the case here. Here, the Court is concerned with an important but relatively small and centralized industry involving the delivery of newspapers, magazines, books, etc. The bargaining unit of the Newspaper and Mail Deliverers' Union encompasses only about 3,000 employees most of whom are employed by the three major newspapers in the New York City metropolitan area. Given these characteristics, this Court finds that experience in labor-management relations need not be the major consideration which should guide the Court in its appointment of an Administrator.

This finding is buttressed by the fact that the Settlement Agreement here is quite detailed and specific. Were such an Agreement broad in its terms, the Administrator would be faced with the need to establish procedures, define specific objectives, and develop the methods to be employed. In such an instance, an Administrator with an extensive background in labor-management work and possibly even familiarity with the industrial unit involved would seem to be indicated. In contrast where the Settlement Agreement is highly detailed, as here, the responsibilities of the Administrator are clearly defined and consequently, his discretion is accordingly more circumscribed and the need for a particular expertise becomes correspondingly less important.

Not to be disregarded, of course, in appointing an Administrator is the assessment of the proposed Administrator by the parties. Since their respective interests clearly will be affected by the Court-approved Settlement Agreement, there should be some assurance that there is confidence in the person to be appointed. In this case, the proposed Administrator is said to be completely satisfactory both to the private plaintiffs and to the EEOC. While it is true that the defendants have not expressed like sentiments, their reservations are

centered on the proposed Administrator's lack of experience in labor-management relations. But, as the Court has already indicated, such expertise, while frequently desirable and even essential, should not always be the prevailing consideration. Sensitivity to the broad social purposes of civil rights legislation and a disposition to fairly and adequately administer the agreement are qualities which, in this Court's view, in this case outweigh whatever lack of expertise may exist. Further, the parties herein have demonstrated a commendable spirit of cooperation which the Court confidently expects will continue during the implementation stage of these proceedings. To that extent the Administrator's task will be made immeasurably less difficult.

Having carefully considered the matter in light of the principles briefly discussed above and after a careful review of a number of qualified men and women who might be available for appointment, the Court has decided to appoint the person named in the Court's letter of September 11, 1974 as the Administrator.

It is so ordered.