John E. PATTERSON, et al., Plaintiffs,

v.

NEWSPAPER AND MAIL DELIVERERS' UNION OF NEW YORK AND VICINITY, et al., Defendants.

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,
Plaintiff,

v.

NEWSPAPER AND MAIL DELIVERERS' UNION OF NEW YORK AND VICINITY, et al., Defendants.

Nos. 73 Civ. 3058 (WCC),
73 Civ. 4278 (WCC).

United States District Court,
S.D. New York.

Sept. 30, 1991.

Penda D. Hair, Washington, D.C., Julius L. Chambers, Charles Stephen Ralston, Ronald L. Ellis, Marina C. Hsieh, New York City, for private plaintiffs.

O'Connor & Mangan, P.C., Mineola, N.Y. (J. Kenneth O'Connor, Thomas T. Heney, of counsel), for defendant NMDU.

E.E.O.C., New York City (James L. Lee, Regional Atty., Anna M. Stathis, Supervisory Trial Atty., Michael J. O'Brien, Trial Atty., of counsel).

Grotta, Glassman & Hoffman, P.A., New York City (Jedd Mendelson, of counsel), for New York Times.

Stroock & Stroock & Lavan, New York City (David J. Weisenfeld, of counsel), for New York Post.

Proskauer Rose Goetz & Mendelsohn, New York City (Kathleen M. McKenna, of counsel), for defendant Maxwell Newspapers, Inc.

William S. Ellis, Interim Administrator, New York City.

Ronald L. Ellis, New York City, for New York News Employees.

**1440**

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

A class of private plaintiffs and the Equal Employment Opportunity Commission ("EEOC") brought two civil rights actions in 1973 against the Newspaper and Mail Deliverers' Union of New York and Vicinity ("NMDU" or "Union") and more than fifty news publishers and distributors within the Union's jurisdiction. Both suits charged that the Union, with the acquiescence of the publishers and distributors, had historically discriminated against minorities, and that the structure of the collective bargaining agreement, combined with nepotism and cronyism, had perpetuated the effects of past discrimination in violation of Title VII of the Civil Rights Act of 1964. Each lawsuit sought an affirmative action program designed to achieve for minorities the status they would have had in the newspaper delivery industry but for the alleged discriminatory practices.

On September 19, 1974, then-District Judge Lawrence W. Pierce issued an opinion and order approving a settlement between the parties and incorporating the Settlement Agreement in a Consent Decree, familiarity with which is presumed. *See Patterson v. Newspaper and Mail Deliverers' Union*, 384 F.Supp. 585 (S.D.N.Y.1974) *aff'd*, 514 F.2d 767 (2d Cir. 1975), *cert. denied*, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976). The case is presently before the court on the motions of defendants New York Times ("Times"), Maxwell Newspapers, Inc. ("Maxwell"), New York Post ("Post"), and the NMDU to modify or vacate the Final Order and Judgment and accompanying Settlement Agreement ("Consent Decree") entered in this action in 1974.

## BACKGROUND

The principal purpose of the Consent Decree, which defendants entered "without admission by any defendant of a violation of Title VII ... or ... 42 U.S.C. § 1981, and without any finding by this Court that any defendant has discriminated against any person or persons because of race, color or national origin," was "to correct the statistical imbalance [of minority individuals]" by "put[ting] minority individuals in the positions they would have occupied had the aforesaid statistical imbalance not existed." The Consent Decree set a "goal" of 25% minority employment in the industry, which was defined as "not an inflexible quota but an objective to be achieved by the mobilization of available personnel and resources ... in a good faith effort to maximize employment opportunities in the bargaining units in the industry represented by the NMDU." *See* Settlement Agreement at ¶ 8. The Decree provided, as the means for achieving this 25% goal, an Affirmative Action program setting specified ratios for the employment and advancement of minority persons.

Under the consent decree, each employer maintains a work force of regular situation holders for its minimum delivery needs. To accommodate fluctuations in circulation, the publishers are permitted to supplement their work force with daily shapers.

The daily shapers are divided into three groups with descending hiring priorities. Those shapers on the Group I list have first priority, after the regular situation holders, in order of their shop seniority. The next priority belongs to Group II shapers. Group II consists of all persons holding regular situations or Group I positions with other employers in the industry. The last priority belongs to Group III shapers.

The Affirmative Action program eliminates the contract provisions that restricted Group I to former regular situation holders, and provides for the orderly flow of Group III shapers into Group I, and from there into regular situations. The agreement mandates that for each non-minority Group III member elevated to Group I, a minority Group III member must also be elevated. Settlement Agreement at ¶ 11. In addition, for every two non-minority persons added to the Group III list, three minority persons must be added. *Id.* at ¶ 15. Regular situations are filled as they become available by advancing the

most senior Group I member without regard to race, color, or national origin. *Id.* at ¶ 10(c).

By Order dated November 30, 1988, after finding that the goal of 25% minority hiring had been surpassed, this Court suspended those provisions of the Settlement Agreement which required 3:2 and 1:1 ratios for placement of individuals on the Group III and Group I lists, respectively, as well as other affirmative action provisions of the Settlement Agreement which had a direct impact on the minority employment goal.

The Settlement Agreement also establishes an Administrator, appointed by the Court, to implement the provisions of the Consent Decree and to supervise its performance. The Settlement Agreement authorizes the Administrator to hear claims concerning violations of the Consent Decree. Appeals from his decisions are heard in this Court.

On April 17, 1985, the Times moved for an order, pursuant to Paragraph 7 of the Final Order and Judgment in this matter dated October 24, 1974, and Rule 60(b), Fed.R.Civ.P., vacating or modifying said Final Order and Judgment on the grounds that (1) the terms of the Final Order and Judgement have been satisfied and (2) relief therefrom is justified under present circumstances.[1] On February 23, 1987, the Court held a hearing to consider defendants motion to terminate the Settlement Agreement. The Court ruled from the bench "that notwithstanding that some employers had reached or exceeded the 25% figures within their respective operations," the goal called for in the Settlement Agreement incorporated in the Consent Decree called for "25% minority employment in the industry." *See* Opinion and Order dated March 15, 1988 at 6–7, 1988 WL 31866. Finding that the 25% goal had not been met industry-wide, this Court deferred its decision on the motion to terminate the Consent Decree until defendants could produce sufficient evidence to demonstrate that minority employment in the bargaining unit had reached 25% throughout the industry as a whole.

On May 30, 1991, having reviewed quarterly reports which indicated that the 25% goal had been met and exceeded, this Court restored the motions to its calendar in order to take the steps necessary to render a decision. As part of this process, the court directed the Interim Administrator to submit compliance reports of all the companies subject to the Settlement Agreement. The Court indicated that upon receipt of the Administrator's findings and after review of submission by the parties, it would address the motions of defendants to modify or terminate the Consent Decree.

## DISCUSSION

■ The Administrator, who is charged to implement the provisions and supervise the performance of the Settlement Agreement, reviewed and evaluated the submissions of each company under his jurisdiction for the purpose of determining compliance with the terms of the Settlement Agreement. After considering all the reports submitted, the Administrator concluded that the minority figure of 28.53% suggested substantial compliance for the industry. Report of the Interim Administrator concerning the Compliance Reports, September 9, 1991 ("Report") at 9.

The NAACP Legal Defense Fund ("LDF") argues, however, that this report is simply a summary of numbers provided by the employers to the Administrator and that the Administrator has taken no action to verify that the numbers actually represent persons working at the various employers and that the persons listed as minorities are actually minority individuals. The LDF maintains that, to the extent that the current percentage of minorities in the industry is relevant to the determination of the pending motion, the Court must grant plaintiffs discovery and allow for an evidentiary hearing on this issue before reach-

---

**1.** On or about April 23, 1985, New York News Inc., the then publisher of the New York *Daily*

ing the merits of defendants' arguments.[2]

The LDF argues that defendants have not proved with admissible evidence that a 25% minority representation has been reached. Moreover, the LDF has stated that it would object to any motion for entry of the Compliance Reports into evidence as the submissions are "overwhelmingly unverified, self-serving hearsay, unsupported, and unreliable."[3] Thirteen of the fourteen employer submissions are unsworn.[4] The Administrator has not placed in evidence an affidavit verifying the information contained in the compliance reports on the basis of his examination of those reports and independent investigation.

The LDF raises serious questions as to the accuracy and reliability of the Compliance Reports. It is necessary to resolve any question regarding the accuracy of said reports before reaching the merits of defendants' pending motions to terminate the Consent Decree. Before exercising its power to modify, a court must be convinced by the party seeking relief that existing conditions differ so substantially from those which precipitated the decree as to warrant judicial adjustment.

## CONCLUSION

This Court hereby directs each defendant to file an affidavit with the Administrator verifying the information contained in the previously filed compliance reports. If plaintiffs feel that discovery on compliance continues to be warranted subsequent to such submissions, they will be allowed limited discovery to investigate the facts underlying the data provided and to verify their accuracy. If plaintiffs so request, the Administrator shall conduct an evidentiary hearing following the close of discovery to determine the validity of defendants' compliance reports. Plaintiffs will bear the burden of proof to show that such reports are incorrect. This Court hereby defers consideration of defendants' motions to modify or terminate the Consent Decree until such time as it receives the Administrator's final report, based upon verified data, that the 25% minority employment figure has been achieved.

SO ORDERED.

---

*News,* made a similar motion.

**2.** LDF argues that it was unable to undertake a complete analysis of the unverified information contained in those documents since it only received the documents in the early evening of September 10, 1991, four days before the deadline to file its surreply.

**3.** The LDF also objects to entry and consideration of the Administrator's Report as it is alleged to be based on wholly unverified data.

**4.** Subsequent to the conference held May 30, 1991, the Administrator requested the filing of compliance reports (letter from William Ellis, dated June 5, 1991). The Times claims that its understanding was that the Administrator would place an affidavit into evidence verifying the information contained in the compliance reports on the basis of his examination of those reports and independent investigation.