John R. PATTERSON, et al., Plaintiffs,

v.

NEWSPAPER AND MAIL DELIVER-
ERS' UNION OF NEW YORK AND VI-
CINITY, et al., Defendants.

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,
Plaintiff,

v.

NEWSPAPER AND MAIL DELIVER-
ERS' UNION OF NEW YORK AND VI-
CINITY, et al., Defendants.

Nos. 73 Civ. 3058, 73 Civ. 4278.

United States District Court,
S.D. New York.

Sept. 30, 1992.

Julius L. Chambers, Charles Stephen Ralston, Ronald L. Ellis, Eric Schnapper, Marina Hsieh, New York City, for private plaintiffs.

Valerie A. Voorhees, New York City, for claim 186 claimants.

Stroock & Stroock & Lavan, New York City (Louis Ginsberg, of counsel), for the New York Post Co., Inc.

Grotta, Glassman & Hoffman, P.A., New York City (Jedd Mendelson, of counsel), for The New York Times Co.

OPINION AND ORDER

WILLIAM C. CONNER, District Judge:

This matter is presently before the Court on the motion of the NAACP Legal Defense Fund, pursuant to Rule 62(c), Fed. R.Civ.P., requesting that the Court stay its Judgment Order of July 29, 1992[1] and restore the injunction of the *Patterson* Con-

1. The LDF styles this as an application to stay the Court's July 8, 1992 Order even though its Notice of Appeal indicates the appeal is from the Judgment entered July 29, 1992. *See* Times' Exh. A.

sent Decree pending appeal of that Judgment to the Second Circuit Court of Appeals.

## BACKGROUND

A class of private plaintiffs and the Equal Employment Opportunity Commission (the "EEOC") brought two civil rights actions in 1973 against the Newspaper and Mail Deliverers' Union of New York and Vicinity (the "NMDU" or "Union") and more than fifty publishers and news distributors having collective bargaining agreements with the Union. Both suits charged that the Union, with the acquiescence of the publishers and distributors, had historically discriminated against minorities, and that the structure of the collective bargaining agreement, combined with nepotism and cronyism, had perpetuated the effects of past discrimination in violation of Title VII of the Civil Rights Act of 1964. Each lawsuit sought an affirmative action program designed to achieve for minorities the status they would have had in the newspaper delivery industry but for the alleged discriminatory practices.

On September 19, 1974, then-District Judge Lawrence W. Pierce issued an opinion and order approving a settlement between the parties and incorporating the Settlement Agreement in a Consent Decree, familiarity with which is presumed.[2] *See Patterson v. Newspaper and Mail Deliverers' Union*, 384 F.Supp. 585 (S.D.N.Y. 1974), *aff'd*, 514 F.2d 767 (2d Cir.1975), *cert. denied*, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976). Paragraphs 1 and 2 of the Consent Decree permanently enjoin both the Union and the defendant employers from engaging in "any act or practice which has the purpose or the effect of discriminating against any individual or class of individuals in their bargaining units represented by NMDU on the basis of race, color or national origin." The injunction provisions also prohibit all defendants from taking "any action which would deprive any such individual of equal employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment because of such individual's race, color or national origin."

The Settlement Agreement established a goal of 25% minority employment in the industry within NMDU bargaining units. *See* Settlement Agreement at ¶ 7. That "goal" was defined as "not an inflexible quota but an objective to be achieved by the mobilization of available personnel and resources ... in a good faith effort to maximize employment opportunities for minorities in the bargaining units in the industry represented by NMDU." *See* Settlement Agreement at ¶ 8. To achieve this goal the Settlement Agreement implements an affirmative action program which modifies the hiring procedures for newspaper deliverers under the industrywide collective bargaining agreement. Under the Consent Decree, each employer maintains a work force of regular situation holders for its minimum delivery needs. To accommodate fluctuations in circulation, the publishers are permitted to supplement their work force with daily shapers.

The daily shapers are divided into three groups with descending hiring priorities. Those shapers on the Group I list have first priority, after the regular situation holders, in order of their shop seniority. The next priority belongs to Group II shapers. Group II consists of all persons holding regular situations or Group I positions with other employers in the industry. Last in order of priority are the Group III shapers.

The Settlement Agreement provides for the orderly flow of Group III shapers into Group I, and from there, into regular situations. The Agreement mandates that for each non-minority Group III member elevated to Group I, a minority Group III member must also be elevated. Moreover, the Agreement requires that for every two non-minority persons added to the Group III list, three minority persons must be added. Through this process, it was intended that the proportion of minority workers in the industry would increase to the 25% goal by June 1979. *See* Settlement

---

2. The Settlement Agreement is divided into four sections: Equitable Relief (¶¶ 1–2), The Administrator (¶¶ 3–6), Affirmative Action Program (¶¶ 7–27), and General Provisions (¶¶ 28–42).

Agreement ¶¶ 11, 12, 15. When that goal was not reached by the specified date, the affirmative action provisions were extended, and later, extended again.

The Settlement Agreement also established an Administrator, appointed by the Court, to implement the provisions of the Consent Decree and supervise its performance. The Settlement Agreement authorizes the Administrator to hear claims concerning violations of the Decree. Appeals from his decisions are heard in this Court.

On April 17, 1985, the New York Times (the "Times") moved for an order, pursuant to Paragraph 7 of the Final Order and Judgment in this matter dated October 24, 1974, and Rule 60(b), Fed.R.Civ.P., to vacate or modify said Final Order and Judgment on the grounds that (1) the terms of the Final Order and Judgment have been satisfied; and (2) relief therefrom is justified under present circumstances.[3] On February 23, 1987, the Court held a hearing to consider defendants' motion to terminate the Settlement Agreement. At the conclusion of the hearing, the Court ruled from the bench that notwithstanding that some employers had reached or exceeded the 25% figure within their respective operations, the goal to be realized was "25% minority employment in the industry." *See* Hearing Transcript at 125. Accordingly, this Court deferred its decision on the motion to terminate the Decree until defendants could produce sufficient evidence to demonstrate that minority employment in the bargaining unit had reached 25% throughout the industry as a whole.[4]

On May 30, 1991, having reviewed compliance reports which indicated that the 25% goal had been met and exceeded, this Court restored defendants' motion to vacate the Consent Decree to its calendar. In order to aid it in rendering a decision, the Court directed the Interim Administrator to submit compliance reports of all defendant companies. On September 9, 1991, the Interim Administrator issued a Report in

which he concluded that "the minority figure of 28.53% suggests substantial compliance for the industry." Report of the Interim Administrator Concerning the Compliance Reports ("Report") at 9.

On September 30, 1991, the Court issued an Opinion and Order in which it deferred consideration of defendants' motion to vacate the Decree in order that the concerns of the LDF respecting the validity of the compliance reports could be addressed. In this regard, the Court indicated that three things would be required or allowed to happen before it again considered the pending motion: (1) each defendant company was to file an affidavit with the Administrator verifying the information contained in the previously filed compliance reports; (2) the LDF and the EEOC could undertake limited discovery concerning the compliance reports "[i]f plaintiffs feel that discovery on compliance continues to be warranted subsequent to such submissions;" and (3) the Administrator was to "conduct an evidentiary hearing following the close of discovery to determine the validity of defendants' compliance reports" "[i]f plaintiffs so request." Opinion and Order, dated Sept. 30, 1991, at 8.

On November 27, 1991, the Administrator provided the Court with a declaration under penalty of perjury, in accordance with 28 U.S.C. § 1746, from each of the defendant companies, through an authorized agent, to the effect that the compliance reports consisted of and/or were based upon corporate business records. Plaintiffs never availed themselves of the opportunity to conduct discovery of the defendant companies with respect to their compliance reports. On April 2, 1992, Interim Administrator Ellis circulated a letter in which he indicated that the LDF did "not intend to conduct any further investigation concerning the compliance reports." The Interim Administrator's letter makes no reference to any request by the LDF for an evidentiary hearing concerning the validity

---

3. On or about April 23, 1985, New York News Inc., the then-publisher of the New York *Daily News,* made a similar motion.

4. By Order dated November 30, 1988, the Court prospectively suspended the 3:2 and 1:1 ratios of the Affirmative Action Program embodied in the Consent Decree.

of the compliance reports. On April 7, 1992, the Court restored the pending motion to modify or vacate the *Patterson* Consent Decree to its calendar for consideration.

After some additional briefing, in an Opinion and Order dated July 8, 1992, this Court granted the motion of defendants Times, Maxwell Newspapers, Inc. ("Maxwell"), New York Post ("Post"), and the NMDU and terminated the Consent Decree in its entirety.[5] The office of the Administrator was retained only to the extent necessary to complete the processing of claims filed prior to the date of the Order—no new claims were to be initiated or processed.

Subsequently, however, the LDF and the EEOC filed a joint motion pursuant to Rule 59(e), Fed.R.Civ.P., seeking to alter or amend the Judgment or Order, dated July 8, 1992. The motion sought to establish a thirty-day grace period in which individuals could file claims regarding matters that accrued prior to July 8, 1992. On July 29, 1992, following oral argument, the Court denied that motion, ruling instead that it would enter a Judgment Order authorizing the Administrator to hear and decide all claims instituted prior to July 29, 1992. The LDF filed a Notice of Appeal from the July 29, 1992 Judgment Order on August 28, 1992, and the EEOC filed a Notice of Appeal from that same Judgment Order on September 25, 1992.

## DISCUSSION

The LDF requests, pursuant to Rule 62(c), Fed.R.Civ.P., restoration of the Consent Decree pending appeal of the Judgment Order entered on July 29, 1992, vacating the Consent Decree and concomitant Settlement Agreement in their entirety.[6] The LDF alleges that since the termination of the Decree, various defendant employers and the NMDU have engaged in numerous

discriminatory and retaliatory actions against minority employees with the intention of wearing them down and discouraging them from standing up for their rights. LDF Memo. at 6–11. Submitted to substantiate the allegations of the LDF are the Declarations of ten minority individuals.

Rule 62(c), Fed.R.Civ.P., provides in pertinent part:

> When an appeal is taken from an interlocutory or final judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party.

Rule 62(c) is an exception to the general rule that jurisdiction passes to the appellate court once a timely notice of appeal is filed. The Rule "does not restore jurisdiction to the district court to adjudicate anew the merits of the case after either party has invoked its right of appeal and jurisdiction has passed to an appellate court." *McClatchy Newspapers v. Central Valley Typographical Union No. 46*, 686 F.2d 731, 734 (9th Cir.), *cert. denied*, 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982). Rather, Rule 62(c) codifies the limited right of the trial court to grant only such relief as may be necessary to preserve the status quo pending an appeal where consent of the Circuit Court has not been obtained. *See Int'l Ass'n of Machinists and Aerospace Workers, AFL–CIO v. Eastern Air Lines, Inc.*, 847 F.2d 1014, 1018 (2d Cir. 1988); *New York v. Nuclear Regulatory Comm'n*, 550 F.2d 745, 758–59 (2d Cir. 1977).

The LDF filed its appeal of the Judgment Order dated July 29, 1992 on August 28, 1992, thereby vesting in the

---

5. Familiarity with the Court's Decision is presumed.

6. While the LDF's motion is titled "Motion to Restore Injunction Pending Appeal," a review of the Memorandum accompanying the motion evidences the LDF's intention to seek restoration of the entire Consent Decree, not simply Paragraphs 1 and 2, the permanent injunction provi-

sions. *See* LDF Memo. at 15 ("[N]on compliance requires the restoration of the decree—and particularly the permanent provisions in Part A and the administrative provisions in Part B—pending appeal.") The motion is thus more akin to one seeking reconsideration of the Court's prior decision terminating the Consent Decree in its entirety.

Second Circuit Court of Appeals jurisdiction over the instant action. Accordingly, this Court may act only to maintain the status quo during pendency of that appeal. Because the status quo as of July 8, 1992, the date of the Court's Opinion and Order terminating the Decree, is that the Consent Decree is of no force and effect, restoration of the Decree based on allegations that the Union and some of the defendant employers have engaged in acts of discrimination subsequent to its termination would be beyond the authority of this Court. While the LDF's Rule 62(c) motion could be denied on this basis alone, the Court believes that a discussion of the Rule 62(c) standard as it applies to the facts of this case is instructive.

The criteria to be used in determining whether an application under Rule 62(c) should be granted are much the same as would be employed on application for a preliminary injunction. Thus, to secure the relief sought in the present case, the LDF must (1) make a strong showing that it is likely to succeed on the merits of the appeal; (2) establish that unless the Consent Decree is restored, the private plaintiffs will suffer irreparable injury; (3) show that restoration of the Decree's provisions will not substantially injure other parties interested in the proceeding; and (4) show that the public interest favors restoration of the Consent Decree. *Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724 (1987); *United States v. Int'l Brotherhood of Teamsters,* 728 F.Supp. 920, 923 (S.D.N.Y.1989).

### A. Likelihood of Success on the Merits

■ This Court adheres to the reasoning set forth in its Opinion and Order dated July 8, 1992, terminating the Consent Decree in its entirety. Accordingly, an extensive exposition of the reasons why the Court believes the LDF is not likely to succeed on the merits of its appeal is unnecessary, and the Court will confine itself to a few brief remarks on this point.

As the Court has noted previously, the Consent Decree was "designed to correct the ... statistical imbalance [of minority

individuals]" by "put[ting] minority individuals in the positions they would have occupied had the aforesaid statistical imbalance not existed." *See* Settlement Agreement, Whereas Clauses. The attainment of 25% minority employment industry-wide was the standard established for measuring compliance with this objective. Minority representation in the membership of the NMDU in the newspaper industry in metropolitan New York was less than 1% when the Consent Decree was issued in 1974. As of March 30, 1992, minority representation was proven to be 27.78% industry-wide. Thus, the stated objective of the affirmative action program set forth in the Consent Decree—25% minority employment industry-wide—has been achieved. Finding that the purposes of the litigation as incorporated in the Consent Decree had been achieved, *see United States v. United Shoe Machinery Corp.,* 391 U.S. 244, 248, 88 S.Ct. 1496, 1499, 20 L.Ed.2d 562 (1968), this Court terminated the Decree.

Contrary to the apparent belief of the LDF, the Decree nowhere states that it should remain in effect until each and every claim of discrimination is resolved. *See* LDF Memo. at 17. Indeed, it is inconceivable that the defendants would have entered into an agreement, the termination of which depended solely upon the unilateral decisions of employees regarding whether or not to charge a given employer with acts of discrimination. Vacation of the Consent Decree, however, does not permit defendants to discriminate against minorities in employment decisions. Title VII and other similar laws remain in effect and are fully applicable to defendants. If subsequent events disclose continuing discrimination, the LDF has every right to proceed against the alleged wrongdoer(s) in a new action.

### B. Irreparable Injury

Pointing to what it alleges to be discriminatory acts occurring in the workplaces of certain defendant employers, the LDF argues that the dissolution of the Consent Decree and the "freeing of defendants from its restraints and from the immediate, ongoing supervision of the Interim Admin-

**1058**

istrator has already resulted in substantial injury to minority workers." LDF Memo. at 17. The LDF has failed to establish, however, that vacation of the Consent Decree leaves any minority individual irreparably harmed, if, in fact, it is later determined that the alleged conduct was unlawful. There are numerous avenues open to those individuals who allege that they have been the victims of discrimination: an individual may bring a claim before the EEOC; the New York State Division of Human Rights; an arbitrator under the applicable labor agreement, or the NLRB if the Union breaches its duty of fair representation by denying proper access thereto; and, of course, the courts, without exhausting Title VII administrative requirements, by commencing an action under 42 U.S.C. § 1981.

The vague references to the alleged pressure on minorities to accept buyouts from their employers and the allegations that minorities are given less desirable jobs because of their race or in retaliation against those who speak out when things are not done by the rules do not suffice to convince the Court that irreparable harm will result if the Decree is not reinstated. Restoration of the Consent Decree would only afford the individuals allegedly discriminated against one more forum, albeit a familiar and convenient one, in which to pursue their claim.

### C. Injury to Other Parties if the Consent Decree is Restored

It is no argument to say, as the LDF does, that mere compliance with the law will shield the defendants from any injury that may come to them from restoration of the Consent Decree. Such an argument overlooks the fact that under the terms of the Settlement Agreement, each defendant is responsible for its share of the costs of the Administrator's services, regardless of whether that particular defendant has been charged with, much less been proved to have committed, discriminatory acts. As this Court noted in its Opinion and Order dated July 8, 1992, the expenses attendant to maintaining the office of the Administrator are substantial. *See* Opinion at 12, 15 n. 11. Accordingly, the Court adheres to

its belief that the more equitable solution—given the fact that the goal of 25% minority employment in the newspaper industry represented by the NMDU has been exceeded—is dissolution of the Consent Decree, so that those employers who have demonstrated an ability to police themselves may be freed from the expense of processing charges against other employers.

### D. The Public Interest

The plaintiffs have not demonstrated that the public interest would be served by restoration of the Consent Decree. Public confidence in the law will be increased with the denial of the LDF's application, and, should it be warranted following the commencement of a new action, the design of a remedial scheme better suited to redressing continuing discrimination, if any, that may be proved thereafter.

### CONCLUSION

For the foregoing reasons, the LDF's motion to restore the Consent Decree pending appeal of the Judgment Order of this Court, dated July 29, 1992, is denied.