**UNITED STATES of America,**
**Plaintiff,**

v.

**WOOD, WIRE AND METAL LATHERS INTERNATIONAL UNION, LOCAL UNION 46; and The Joint Apprenticeship Committee of the Employing Metallic Furring and Lathing Association of New York and Local No. 46 of the Wood, Wire and Metal Lathers International Union, Defendants.**

No. 68 Civ. 2116.

United States District Court,
S. D. New York.

March 28, 1972.

Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., for plaintiff; Michael C. Silberberg, Joel Harris, New York City, of counsel.

Doran, Colleran, O'Hara & Dunne, New York City, for defendant, Wood, Wire & Metal Lathers International Union, Local No. 46; Walter Colleran, New York City, of counsel.

Doran, Colleran, O'Hara & Dunne, and M. Carl Levine, Morgulas & Foreman, New York City, for defendants, The Joint Apprenticeship Committee of Employing Metallic Furring & Lathing Assn. of New York and Local No. 46 of the Wood, Wire & Metal Lathers International Union; Walter Colleran, Albert Foreman, New York City, of counsel.

## MEMORANDUM

FRANKEL, District Judge.

The United States, on May 22, 1968, instituted this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., to correct an alleged "pattern and practice of discrimination in

employment against Negroes on account of their race." Following the congressional mandate for speedy handling of such cases, 42 U.S.C. § 2000e–6(b), the Government moved promptly for assignment of the case to a single judge for all purposes. While the plaintiff continued to proceed diligently, discovery efforts and occasional talks of settlement consumed many months. Finally, with a trial date set, the parties made an agreement dated February 7, 1970, which became the basis for, and part of, a consent decree dated February 24, 1970. The agreement has been described in some detail in a published opinion, see 328 F.Supp. 429 at 433–434, and that description need not be repeated here. Suffice it to say that the agreement and decree were meant to bar exclusionary union practices, to require regular reports of compliance, and, very significantly, to create and fill an office of Administrator to exercise close, detailed supervisory and directory authority over the achievement of the decretal purposes. The Administrator was to have not mere policing functions, but the broadly creative role, in close contact with the parties and their work, of evolving "rules and procedures" to implement the goal of "equal employment opportunities."

The Administrator proceeded to function earnestly and energetically. Defendant union persisted, however, in a continued "pattern and practice of discrimination." *Id.* at 434. On November 5, 1970, the Government moved to have the union held in civil contempt. Discovery was ordered pursuant to this motion, and then an evidentiary hearing lasting for seven days or so. The claim of contempt was in large measure sustained. The union was found to have discriminated in job referrals of minority workers. The relief ordered included back pay awards to be determined in supplementary proceedings before a special master. The functions of the Administrator were continued and, in at least one respect, accelerated: the formulation of "rules and procedures" to promote equal treatment, originally intended for completion within some six months of the settlement agreement, was ordered to be accomplished under a prescribed timetable. See *id.* at 440–441.

The Administrator continued his detailed duties of study, supervision and attempted mediation. When the parties were unable to agree upon revised "rules and procedures," he submitted, in accordance with the opinion of June 2, 1971, on the contempt proceeding "a set proposed by him for adoption and enforcement." 328 F.Supp. at 441. The court, with minor modifications, confirmed and ordered the effectiveness of those rules and procedures, recording this action in a brief opinion of July 16, 1971.

The basic goal of expert and knowledgeable management by the Administrator has been achieved in substantial measure, largely avoiding an intolerable regime of daily and minute supervision by the court. Among the significant labors of the Administrator was that mandated by paragraph 10 of the settlement agreement, which required him to

"make an objective study of the issues relating to the issuance of work permits based upon the needs of the industry and taking into account the purpose of achieving equal employment opportunity, which study may include such factors as the total number of work permits to be issued, the number of permits to be issued from time to time, and the manner of issuance, and based upon such study shall recommend such changes, if any, as he deems advisable in the system for the issuance of permits."

It was further provided in the same paragraph that:

"Any change in the system for the issuance of permits shall require either the agreement of the parties hereto or the approval of the Court."

On December 10, 1971, the Administrator issued a "Study with Recommendations" pursuant to paragraph 10 of the agreement. He stated "three major goals" of the study:

"1. To redress the effects of past exclusionary practices;

"2. To provide equal opportunity of employment to all present and future applicants for work in the industry within the jurisdiction of the Union;

"3. To achieve these aforementioned goals without adversely affecting the present work force."

He proceeded then to outline the relevant percentage figures of employment, the objective of approximating minority group representation to its proportion in the population, the projected prospects of new employment in the ensuing four years, and proposed ranges for partially redressing the racial imbalance over the course of those years. He listed eight recommendations for the achievement of that limited goal. Among other things, he directed issuance of "one minority permit for each white permit" (with a minimum total of 250 to be issued each year), these to be in addition to 100 minority permits he had previously ordered.[1] The other provisions of his order, part of our record, need not be repeated here. It is noteworthy, however, that the Administrator wisely took account of the limits of foresight; he provided explicitly for new or modified "standards and procedures" as developing experience might dictate a need therefor.

Government counsel approved, and urged voluntary acceptance of, the Administrator's recommendations of December 30, 1971. The union responded with a substantial rejection. On February 4, 1972, the Government moved for an order enforcing the steps the Administrator had recommended. In opposition to the motion, an affidavit of counsel attacked the statistical premises of the Administrator's recommendations, argued vaguely (and in largely inapposite terms) that employment opportunities in the union's field are declining, predicted a future bleaker than that the Administrator had foreseen, and urged that "the Study and Recommendation [sic] be remanded to the Administrator to be reconciled in accordance with the [union's] comments and observations." The Chairman of the Joint Apprenticeship Committee repeated these general views and sought "a hearing where all these facts can be presented in fuller detail." Finally, counsel for the union, in a supplemental affidavit, adduced some data relating to the "actual experience in the hiring hall" for the autumn and winter of 1971–1972 (but without comparative figures to give point to these admittedly slack-season statistics), and urged, on the basis of that information, that the Administrator's recommendations be blocked until he "can show a more reasonable expectation of employment opportunity based on the needs of the industry * * *."

The parties were heard on the Government's motion on March 3, 1972. Defendants announced that they had nothing to offer in supplementation of counsel's affidavits. It seemed clear from the materials presented that the methodology, the premises and the recommendations of the Administrator were the results of careful, thorough study and

---

1. On January 17, 1972, implementing a decision he had rendered on December 20, 1971, the Administrator ordered the issuance of new work permits to "all non-white workmen who held valid work permits during the year 1970" and, "commencing May 1, 1972, [to] non-white workmen who are determined to be eligible for such permits by the minority referral sources * * * until the total

of work permits issued * * * reaches 100 work permits." Both the decision and the order followed an order of this court dated October 21, 1971. As indicated above, the "Study and Recommendations" now before the court rest upon the assumption that the 100 work permits required by the January 17 order have been, or will be, issued.

were compellingly reasonable in light of the goals and the problems confided to him. Nothing tendered in opposition suggested otherwise. It was apparent, of course, that later experience might expose a need for correcting the Administrator's projections. But his recommendations carefully and explicitly allowed for that. The Apprenticeship Committee, which had tossed out a suggestion that there should be a "hearing" on some "facts," proposed no concrete occasion for any such hearing. The union did not make or press the suggestion.

It seemed clear, in short, that there was no substantial ground for resisting or further delaying adoption of the recommendations evolved by the Administrator after lengthy study. There was no suggestion—the court knows that there could not have been—that the Administrator had failed to meet with the parties and heed their submissions. There was no suggestion that he had ever failed or refused to hear anything they wanted heard. There appeared, in sum, to be no solid question concerning the procedural and substantive propriety of what the Administrator had done.

 It has never been assumed or claimed by anyone in the case that the Administrator, in making the study and recommendations called for by paragraph 10 of the parties' agreement, should or could proceed upon a formal evidentiary record. And there is no basis in practical sense or law for supposing that the court might at this late date usefully embark upon the making of any such record. The relevant analogy is, of course, to administrative rule-making rather than adjudication, and it is familiar learning by now that administrators need not go through the forms of a trial in fashioning rules. See, e. g., California Citizens Band Association v. United States, 375 F.2d 43, 54 (9th Cir.),

cert. denied, 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967); W. Gellhorn and C. Byse, Administrative Law 486–91 (5th ed. 1970). As to the soundness of the "legislative facts" underlying the Administrator's views, especially in light of the statutory purposes and the consent decree comprising his mandate, the union makes debater's points but no arguments sufficient to raise doubts as to the soundness of the recommendations.

Even on the fallacious assumption that the Administrator's work must be checked for "substantial evidence" or be undone if it is "clearly erroneous," defendants submitted nothing to raise genuine issues. There has been, in a word, nothing to hear. The attempted launching by the court of an evidentiary hearing would have been without direction or purpose. And this quite apart from the fact that such a hearing, after all that has gone before, would be a stultifying negation of the understanding upon which the parties selected, and the court named, the distinguished Administrator over two years ago.

Accordingly, the court made an order on March 13, 1972, enforcing the Administrator's recommendations of December 30, 1971, and his order of January 17, 1972.[2]

On March 23, 1972, government counsel presented for signature an order requiring defendant union to show cause why it should not be held in contempt of the March 13 order. Also on March 23, the court was informally advised that the union was going to appeal (though it had not yet filed notice) from the order of March 13, and that it desired a stay pending appeal. The court heard counsel on the afternoon of March 24, 1972. At that time, because of the modification then proposed by the court (note 2, *supra*), government counsel agreed to postpone any proceeding for

---

2. The order of March 13 was modified on March 27, 1972, to erase a possible ambiguity. It does not appear that any-thing central to the case turns upon the modification.

contempt. At the same time, the court indicated that the application for a stay would probably be denied and that compliance in this now aged case would be expected promptly, subject, of course, to reversal or modification of these views by our Court of Appeals or a Judge thereof.

Now, having concluded that the court's tentative position against a stay should be adhered to, this memorandum is filed both to explain this conclusion and to guide the parties in the days ahead.

 For the most part, the grounds for the determination denying a stay have been stated already. This case has been very long in process. The attempt to cure the stark pattern of racial discrimination in defendant union has entailed long labors by many people,

all still far from ended. The injuries to the union and its members from giving possible work opportunities to a few black and Spanish-speaking people pending appeal cannot be deemed momentous in the setting of this case. And the union's prospects on appeal do not seem bright—a matter which is, of course, pertinent in considering a stay.[3]

In approving the Administrator's recommendations and denying a stay, the court has not overlooked or entirely discounted the union's plaint that this may cause increased unemployment for incumbent members and permit holders. The Administrator, seasoned in labor matters, was keenly and explicitly concerned with this. His judgment, which only experience can fully vindicate or belie, was that his recommendations could effectuate the goals of the statute

---

3. In its application for a stay, the union argues that the Administrator's recommendations should now be held invalid under § 703(j) of the 1964 Act, 42 U.S.C. § 2000e–2(j), which provides:

"Nothing contained in this subchapter shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area."

This argument was not made in opposition to the Government's motion of February 4, 1972, to enforce the Administrator's recommendations, and, indeed, until almost two weeks after the entry of this court's order granting the motion. It mer-

its rejection for this reason alone. But it is also without merit.

Even upon an initial grant of injunctive relief, the courts have found it perfectly consistent with § 703(j), and plainly required to prevent broad nullification of Title VII, to grant "affirmative relief against continuation of effects of past discrimination resulting from present practices (neutral on their face) which have the practical effect of continuing past injustices." United States v. International Bro. of Elec. Wkrs., L. No. 38, 428 F.2d 144, 149 (6th Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970). The Administrator's recommendation herein resembles the pattern of alternate white and black referrals sustained as a suitable item of temporary injunctive relief in Local 53 of Int. Ass'n of Heat & Frost I. & A. Wkrs. v. Vogler, 407 F.2d 1047 (5th Cir. 1969). See also Contractors Ass'n of Eastern Pa. v. Secretary of Labor, 442 F.2d 159 (3d Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); NAACP v. Allen, 340 F.Supp. 703 (M.D.Ala.1972). Here, it bears recalling, we are far beyond the preliminary injunction stage. We are proceeding upon a consent decree entered over two years ago and an unappealed decision almost a year ago finding a grave course of contumacious defiance. The relief found proper in the cited cases would appear to have *a fortiori* justification in our situation.

and consent decree "without adversely affecting the present work force."

But it should be recognized, too, that the remedies Congress ordered are not required to be utterly painless. The court knows at least some of the things the whole world knows. We are aware that there is unemployment. We are even more keenly aware that this case is launched by statutory commands, rooted in deep constitutional purposes, to attack the scourge of racial discrimination in employment. We know without parading the familiar literature that discrimination of the type here in question has among its intertwined causes the desire of the discriminators to preserve job preferences and other economic advantages.[4] And we know that, in addition to the spiritual wounds it inflicts, such discrimination has caused manifold economic injuries, including drastically higher rates of unemployment and privation among racial minority groups.

It is not startling, then, though it may be morose and grudging, to hear the union repine that the remedy for such evils may seem like an order "to let new men share in the unemployment." Perhaps it might be more positive to say that the objective is to allow those on the outside to enter and share in the *employment.* However it is phrased, the remedy must be administered under the clear command of the clearly valid legislation governing the parties and the court alike.

In short, the order in effect since March 13, 1972, should already have prompted steps of good-faith compliance. There has been no stay. There will be none unless a higher court orders it. Defendants should pattern their conduct upon this posture of the case.

4. The court has received a substantial number of letters from members of Local No. 46 complaining of the decision of the Administrator and the court's enforcement thereof. While such correspondence is not, strictly, part of any formal record, one writer expresses with somewhat poignant simplicity the familiar point just made in the text. He writes in part:

"We all realize we must take in minority workers. We have been reluctant to do so but it wasn't done out of hatred. Our union was started by our Grandfathers and passed on to our Fathers who passed it on to us. They built the industry to where it is, today. There are a lot of businesses, professions and other organizations that the sons follow in their Fathers foot steps. We are accused of discrimination. Our crime was, being jealous of what we had built and taking care of our own."