514 F.2d 767
 10 Fair Empl.Prac.Cas. 349, 9 Empl. Prac.
Dec. P 10,033
John R. PATTERSON et al., Plaintiffs-Appellees,
v.
NEWSPAPER AND MAIL DELIVERERS' UNION OF NEW YORK AND
VICINITY et al., Defendants-Appellees.
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiffs-Appellees,
v.
NEWSPAPER AND MAIL DELIVERERS' UNION OF NEW YORK AND
VICINITY et al., Defendants-Appellees,
Dominick Ventre et al., Intervenors,
James V. Larkin, Intervenor-Appellant.
 No. 626, Docket 74-2548.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 9, 1975.
Decided March 20, 1975.
 
 Michael B. Targoff, New York City (Willkie, Farr & Gallagher, Deborah M. Greenberg, Jack Greenberg, Edward F. Greene, New York City, of counsel), for plaintiffs-appellees.
 O'Donnell & Schwartz, New York City (Michael Klein, New York City, of counsel), for defendant-appellee Newspaper and Mail Deliverers' Union of New York and Vicinity.
 Michael S. Devorkin, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty. for the Southern District of New York, Gerald A. Rosenberg, Asst. U. S. Atty., William A. Carey, Gen. Counsel, Equal Employment Opportunity Commission, Joseph T. Eddins, Associate Gen. Counsel, Charles L. Reischel, Beatrice Rosenberg, Attys., New York City, of counsel), for plaintiff-appellee Equal Employment Opportunity Commission.
 Herman H. Tarnow, New York City, for intervenor-appellant Larkin.
 Before FEINBERG, MANSFIELD and OAKES, Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 At issue on this appeal is the appropriateness of relief against discrimination in the employment of news deliverers. In the past we have been called upon to review relief granted in cases where discrimination has been established under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., including the use of minority percentage goals and affirmative hiring and promotion programs. See, e. g., Rios v. Enterprise Assn. Steamfitters, Local 638, 501 F.2d 622 (2d Cir. 1974); Bridgeport Guardians, Inc. v. Bridgeport Civil Serv. Comm., 482 F.2d 1333 (2d Cir. 1973); United States v. Bethlehem Steel Corp., 446 F.2d 652 (2d Cir. 1971). The present appeal presents several variations on the theme. Unlike previous cases the affirmative relief under attack here does not result from an order of the district court entered after a determination of the merits of the action but from a settlement agreement between the plaintiffs, who are minority persons seeking employment as news deliverers, the defendant Newspaper and Mail Deliverers of New York and Vicinity ("the Union" herein), and the Government. The settlement was reached after a four-week trial in the Southern District of New York before Lawrence W. Pierce, Judge, who approved the agreement. The person challenging the relief is not an aggrieved minority employee but a white non-union worker, James V. Larkin, who, having been permitted to intervene, seeks to set aside the agreement as unlawful on the ground that it affords benefits to minority workers[1] not given to similarly situated white workers, retarding the advancement rate and diluting the work opportunities of these white workers.
 
 
 2
 Because he had heard a four-week trial in this case and because of the public interest involved in a Title VII action, Judge Pierce considered in a thorough opinion the merits of the plaintiffs' action and the conformity of the settlement to the goals of Title VII and the rights of the parties. See 384 F.Supp. 585 (S.D.N.Y.1974). We find no abuse of discretion in Judge Pierce's approval of the settlement and therefore affirm.
 
 
 3
 This appeal arises out of two consolidated actions. One was brought by the Equal Employment Opportunity Commission against the Union, the New York Times ("Times" herein), the New York Daily News ("News" herein), the New York Post ("Post" herein), and about 50 other news distributors and publishers within the Union's jurisdiction. The other is a private class action on behalf of minority persons. Both complaints allege historic discrimination by the Union against minorities, and charge that the present structure of the Union's collective bargaining agreement and the manner of its administration by the Union perpetuate the effects of past discrimination in a manner that violates Title VII. The defendant publishers are alleged to have acquiesced in these practices. Appellant Larkin is one of approximately 100 white non-union "Group III" workers at the News who were given permission to intervene under F.R.Civ.P. 24(a)(2) because of their potential interest in the relief to be fashioned.
 
 
 4
 The Union is the exclusive bargaining agent for the collective bargaining unit which embraces all workers in the delivery departments of newspaper publishers and of publications distributors in the general vicinity of New York City, including, in addition to the city proper, all of Long Island, northeastern New Jersey counties, and north to Fairfield County, Connecticut. Of 4,200 current Union members, 99% are white.
 
 
 5
 Due to variations in the size and quantity of publications to be distributed, the needs of distributors for delivery personnel vary from day to day and from shift to shift. For that reason the work force in the industry is separated by the Union agreement into (1) those holding permanently assigned jobs ("Regular Situations") and (2) those called "shapers," who show up each day to do whatever extra work may be required on that day. The work performed by persons in both categories is unskilled. Shapers are divided into four classifications, Groups I-IV. The order in which shapers are chosen for extra work on each shift is determined according to Group number and by shop seniority of members within each group.
 
 
 6
 Group I, the highest priority group, consists solely of persons who once held Regular Situations in the industry. Each employer maintains his own Group I list, which is comprised of persons who have been laid off from Regular Situations at other employers, or who have voluntarily transferred from Regular Situations or from classifications as Group I shapers at another employer. When a Regular Situation becomes available, the highest seniority person on the employer's Group I list is offered the position.
 
 
 7
 Group II is an aggregate list compiled from the entire industry and consists of all Regular Situation holders and Group I members. Taking priority after Group I is exhausted, it enables regulars and Group I members to obtain extra daily work at employers other than their own.
 
 
 8
 Major employers maintain a Group III list, which consists of persons who have never held a Regular Situation in the industry. Members of Group III are given daily work priority after Group II. To maintain Group III status, workers are required to report for a certain number of "shapes" each week. Prior to the settlement agreement under review Group III members were theoretically entitled by shop seniority to any Regular Situation that became available if the Group I list had been exhausted. Group IV shapers are last in prority and are required to appear for a shape far less frequently than Group III shapers.
 
 
 9
 Although the Union represents all delivery workers, membership is limited to Regular Situation holders and Group I members. Historically the Union has excluded minorities and has limited its membership to the first born son of a member. Aside from the chilling effect which restriction of Union membership to whites might by itself have upon minority persons seeking delivery work, there is evidence that minorities were also discouraged from gaining entrance to Group III lists, even though Group III shapers are not members of the Union. Of 2,855 persons now actively seeking work in the industry (which includes 2,460 Regular Situation holders, 123 Group I shapers, and 273 Group III shapers) only 70, or 2.45%, are minority persons.
 
 
 10
 While the current Group Structure, which was adopted in 1952, appears on its face to open Union membership to anyone in the labor force, Union membership, because of lax administration of the contract provisions, has largely remained attainable only by the family and friends of a Union member. Due to artificial inflation of the Group I lists, no person has in practice made the theoretically possible jump from Group III to a Regular Situation since 1963. The evidence suggests that this expansion of the Group I lists has been accomplished primarily by use of voluntary transfers of Group I or Regular Situation holders from the lists of smaller distributors to the Group I lists of more desirable, larger employers, and ultimately to Regular Situations there. Other devices include fictitious lay-offs, enabling the Union member to transfer to Group I of a different employer, and outright false assertions of Group I status by persons who have obtained Union membership cards, the validity of which have not been challenged by employers.
 
 
 11
 On the basis of this evidence, which was largely uncontroverted, Judge Pierce, in approving the settlement, had no difficulty concluding that the Union's practices amounted to a violation of Title VII, since they served to " 'lock-in' minorities at the non-union level of entry in the industry, and thereby to perpetuate the impact of past discrimination . . ..," conclusions that appear fully justified by the record and are not challenged here. See Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Rios v. Enterprise Assn. Steamfitters, Local 638, supra ; United States v. Wood, Wire & Lathers, Intl. Union, Local No. 46, 471 F.2d 408 (2d Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973); United States v. Bethlehem Steel Corp., supra.
 
 
 12
 The settlement agreement reached by the parties provides that the Union shall be permanently enjoined from discriminatory practices in violation of Title VII. It establishes an administrator to insure compliance with the terms of the agreement, and provides for the elimination of past abuses, primarily by abolishing voluntary transfers by Union members. It establishes a minority hiring goal of 25%, specifies a procedure for attaining that goal, and provides for back pay to minority workers. Most of these provisions are not challenged by Larkin.
 
 
 13
 The 25% goal is to be reached throughout most of the industry by requiring that all incumbent minority persons on the Group III list of each employer as of the date of entry of the order are to be moved immediately to Group I. All new persons hired in the industry and classified in Group III will be employed according to a ratio of three (3) minority persons to two (2) non-minority persons. As each Regular Situation is filled by a Group I member, one Group III member shall be moved to Group I and offered Union membership. This is to be done on an alternating one-for-one basis between minority and non-minority workers. Each two vacancies in Group I will thus be filled by the minority worker in Group III having highest seniority and the highest seniority non-minority worker. The agreement also modifies these provisions insofar as they apply to the smaller employers and to the Daily News, taking into account special conditions affecting each. At the News, an equal number of non-minority persons from Group III will follow those minority workers who move onto the Group I list on the date of the order; also, for a certain time, one minority and one non-minority person will replace each person on the Group I list promoted to a Regular Situation.
 
 
 14
 Larkin's objection to the settlement is premised on the observation that Group III white workers have not benefited from the Union discrimination which is the object of this lawsuit. On the contrary, as Judge Pierce recognized, they too have suffered from Union policies which barred Group III workers from access to Group I and permanent jobs. Upon this premise, Larkin first broadly asserts that because the Group III whites were also discriminated against, they are entitled to the same relief as the minority workers. More specifically, he objects to those aspects of the affirmative action plan which, he asserts, allow minorities to "leap-frog" non-minorities with greater seniority. He also attacks the 25% goal.[2]
 
 DISCUSSION
 
 15
 The scope of our review of a district court's approval of a settlement agreement is limited. "(T)he appellate court should intervene only on a clear showing that the trial judge was guilty of an abuse of discretion," State of West Virginia v. Chas. Pfizer & Co., 440 F.2d 1079 (2d Cir.), cert. denied, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). While the public objectives embodied in Title VII warrant a careful review of the provisions of the settlement in light of those policies, see Rios v. Enterprise Assn. Steamfitters, Local 638, 501 F.2d 622, 628 n. 4 (2d Cir. 1974), the clear policy in favor of encouraging settlements must also be taken into account, see Florida Trailer & Equipment Co. v. Deal, 284 F.2d 567, 571 (5th Cir. 1960), particularly in an area where voluntary compliance by the parties over an extended period will contribute significantly toward ultimate achievement of statutory goals. Nor should we substitute our ideas of fairness for those of the district judge in the absence of evidence that he acted arbitrarily or failed to satisfy himself that the settlement agreement was equitable to all persons concerned and in the public interest, cf. United States v. Wood, Wire & Metal Lathers Intl. Union, Local No. 46, 471 F.2d 408, 416 (2d Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973), especially in a case like the present one where the settlement was approved after a four-week trial of the merits, and two hearings with respect to the fairness and adequacy of the proposed agreement. Furthermore, unlike appeals from decrees of the district court entered after trial on the basis of findings and conclusions where we may modify the terms of the decree, see, e. g., United States v. Bethlehem Steel Corp., supra, we are powerless to rewrite the provisions of the settlement agreement. Our only alternative, if we concluded that Judge Pierce had abused his discretion, would be to set aside his approval of the settlement and remand the case for completion of the trial. United States v. Automobile Manufacturers Assn., 307 F.Supp. 617 (C.D.Calif.), affd. per curiam sub nom., City of New York v. United States, 397 U.S. 248, 90 S.Ct. 1105, 25 L.Ed.2d 280 (1970).
 
 
 16
 Although Larkin objects to the use of a 25% goal and to Judge Pierce's conclusion that the minority make-up of the relevant part of the labor force is 30%, he does not suggest any alternative or more reliable figures as to the labor force; he merely calls the court's figures "contrived." In contrast to his failure to provide any evidentiary support for his objection, the record reveals that, in concluding that the 25% goal was appropriate, Judge Pierce relied on population figures in the Department of Commerce's publications General Population Characteristics 1970 Census of Population and General Social and Economic Characteristics, 1970 Census of Population, and took into account the relevant geographic area and demographic charcteristics of those making up the news delivery work force. Thus his conclusion, which followed closely the guidelines laid down in Rios v. Enterprise Assn. Steamfitters, Local 638, 501 F.2d 622 (2d Cir. 1974), was adequately based.[3]
 
 
 17
 Larkin's argument that he is entitled to the same benefits as the minority workers must also be rejected. This case arises under a statute which by its terms is limited to protection against employment discrimination based on an individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Larkin does not allege discrimination against him based on any of these factors. He argues only that the industry's past practices discriminated against all Group III members, minority and non-minority, and that while the settlement agreement remedies the discrimination against minority persons it fails to afford any relief for the harm caused to non-minority persons. Worse still, he asserts, the relief to minority persons is at the expense of the white Group III workers.
 
 
 18
 At first glance this argument has much appeal. As the district court recognized, Group III workers were the victims of some practices that were harmful to all Group III members, regardless of race. Minority members, on the other hand, were the targets of racial discrimination on the part of the virtually all-white Union. In this Title VII action we are limited to consideration of the fairness of relief directed only to the latter. The objective of Title VII is to "attack the scourge of racial discrimination" which has "caused manifold economic injuries, including drastically higher rates of unemployment and privation among racial minority groups." United States v. Wood, Wire & Metal Lathers Intl. Union, 341 F.Supp. 694, 699 (S.D.N.Y.1972), affd., 471 F.2d 408 (2d Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973). It creates no rights or benefits in favor of non-minority persons or groups. Any past denial of promotion rights to Larkin is clearly not remediable under Title VII. Indeed, Group III white workers have unsuccessfully sought relief for themselves under other statutes. It is thus apprent that Larkin has no right to any of the affirmative relief afforded to the minority groups, including the back pay provisions.[4] Our review, therefore, must be limited to the question of whether the settlement agreement, in remedying minority discrimination, treats the intervenors fairly. See State of West Virginia v. Chas. Pfizer & Co., 440 F.2d 1079 (2d Cir.), cert. denied, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971).
 
 
 19
 The affirmative-action provisions of the agreement under review affect Group III workers in the industry, and particularly Daily News workers, in two ways. First, the provisions for immediate transfer of incumbent minorities at major employers to Group I and for the filling of Group I openings by alternately promoting one minority worker and then one non-minority worker from Group III to Group I mean that a white Group III worker will advance to Group I less rapidly than would be possible if straight shop seniority were the basis of promotion. Indeed, a time will shortly come when minority persons not employed in the industry at all on the date when the agreement went into effect may achieve Group I status before many Group III whites with seniority. Although this feature of the agreement is not as beneficial to Larkin as would be promotion on the basis of straight seniority regardless of race, the agreement nevertheless benefits Larkin. It presents him with an opportuniy he never had before: the chance to move up to Group I, and eventually to a Regular Situation. Before, there was in effect no seniority system with respect to promotion into Group I. Thus any plan for advancement of Group III members to Group I could only be beneficial to Larkin. Approval of the plan can hardly be labelled an abuse of discretion because it does not advance Larkin as rapidly as minority persons with less seniority. A reasonable preference in favor of minority persons in order to remedy past discriminatory injustices is permissible. See Rios v. Enterprise Assn. Steamfitters, 501 F.2d 622 (2d Cir. 1974).
 
 
 20
 Second, the agreement affects daily work priorities. Its provision that all present incumbent Group III minority workers shall move at once into Group I immediately drops Group III whites in daily priority by whatever number of minority workers of lesser seniority are added to the higher priority Group I. Furthermore, the one-to-one ratio for promotion thereafter of workers from Group III into Group I as openings in Group I become available means that an average non-minority Group III worker will not advance as quickly up the daily priority ladder within Group III as he would under straight raceless seniority. This results from the fact that, whenever two openings in Group I become available, one will be filled by a white worker senior to him and one by a minority worker of lesser seniority. Thus he moves up only one step for every two Group I openings.
 
 
 21
 The situation is even less favorable at the Daily News where for an initial period, as each Group I opening (rather than two openings) becomes available, the employer will add one minority and one non-minority employee to Group I. The effect of this expansion of Group I to take in minority members of lesser seniority is likely to slow down the rate of advancement of non-minority persons within Group III more than under a one-for-one arrangement limited to an equal number of vacancies in Group I. Of course, in all cases once a Group III white employee reaches Group I, he will move up in daily work priority (and priority for a Regular Situation) on the same basis as existed before the agreement.
 
 
 22
 Appellant characterizes these effects as "leapfrogging" or "bumping" of incumbent white workers, see United States v. Bethlehem Steel Corporation, supra, 446 F.2d at 659, and argues that we have rejected other affirmative action programs having such an effect. It is true that we have suggested that court ordered relief involving minority employment goals be confined to entry level positions. Thus in Bridgeport Guardians, Inc. v. Bridgeport Civil Serv. Comm., 482 F.2d 1333 (2d Cir. 1973), we upheld the imposition of racial hiring quotas at the patrolman's level, the entry level of the police force, but rejected the use of such quotas for promotion to higher ranks. In United States v. Bethlehem Steel Corp., 446 F.2d 652 (2d Cir. 1971), we simply noted that minority transferees under the court's order would be transferred into job vacancies created in the normal course of business and that no incumbent employee would be "bumped" out of his job. Id. at 664. In neither case did we specifically pass on the propriety or fairness of "bumping" an incumbent.
 
 
 23
 These cases do not support rejection of the agreement that has been reached in this case. The Bridgeport Guardians decision was based upon the failure to establish any discrimination within the promotional system, the proof being limited to discrimination at the point of entry into the police force, i. e., in qualifying for the rank of patrolman. See 482 F.2d at 1338-41. In the present case, on the other hand, there has been racial discrimination throughout the industry. Furthermore, even assuming the desirability of confining use of quotas to entry level positions, the effective point of entry into employment in the industry has been at Group I, not Group III. Judge Pierce found that "Group III workers do not have full-time employment, nor do many of them have great expectations or intentions of working full-time while they shape from the Group III list." It is true, as appellant points out, that both Group I and Group III workers must shape regularly and neither has assurance of regular work. But the fact remains that traditionally a worker who reached Group I was on the road to a Regular Situation, whereas one who was in Group III would not progress above that level.
 
 
 24
 Even assuming that "bumping" of incumbents from their present jobs is inadvisable in an affirmative hiring scheme, it is inaccurate to characterize Group III workers as having been "bumped." They have retained their positions; they have not been delisted in favor of minorities. Moreover, we are not dealing with workers who have been steadily employed under conditions where seniority is synonymous with an assured job but with a fluctuating group of shapers competing for a limited amount of work that varies widely from day to day. Although some may have declined somewhat in their daily work priority, as Judge Pierce pointed out, the actual effect of this decline is difficult to gauge since the availability of work at a given shape "depends on the stability of the total number of jobs available from shift to shift and whether or not the new person chooses to shape the same shift. In other words, assessing a shaper's expectation is a highly speculative exercise." In addition, the number of minority workers promoted to Group I on the date the agreement became effective, which solely accounts for any decline in daily work priority, is quite small. Only 13 of 178 Group III members at the News were minority persons, 6 of 34 at the Times.
 
 
 25
 The impact of any dilution of daily work opportunities resulting from the settlement agreement is, furthermore, softened by the fact that all current Group III members will be elevated to Group I within a fairly short time. The News estimates that within a month after implementation of the plan all non-minority workers above 47 on the Group III list will be elevated to Group I and that thereafter about 27 non-minority persons per year will be promoted from Group III to Group I. This suggests that any decline in daily work priority attributable to the promotion of presently incumbent minority workers to Group I will be offset for most workers by a rise in priority within Group III resulting from the expeditious upward movement of Group III whites, also made possible by the program. Finally, should some Group III workers have difficulty finding work, the agreement empowers the administrator to assure that any existing work opportunities in the industry be made available to those unable to get at least 45 shifts of work in a calendar quarter.
 
 
 26
 Aside from the foregoing, there was evidence from which it could be inferred that, if there had been no racial discrimination in the industry, more minority persons would have been able to enter Group III and to gain seniority over many whites within Group III. Thus, although Larkin has been the victim of a system which excluded Group III members, minority and white, from promotion to Group I, he may well have been the modest beneficiary, vis-a-vis the minority work force, of a policy that discouraged minority persons from entering Group III. To the extent that the settlement may cause a temporary decline in Group III white worker's rate of promotion and daily work priority, it merely compensates for past discrimination by allowing a reasonable number of minority persons to be promoted to the "rightful place" on the seniority ladder, which they would have occupied but for industry-wide racial discrimination.
 
 
 27
 In any event it must be recognized that rights of the kind Group III workers here assert "are not indefeasibly vested rights but mere expectations derived from a bargaining agreement and subject to modification." United States v. Bethlehem Steel Corp., supra, 446 F.2d at 663. Here appellant has applauded those modifications of the collective bargaining agreement that are favorable to him, such as the removal of the provision limiting Group I to former Regular Situation holders. Under the peculiar circumstances that have governed employment in this industry it does not strike us as unfair to impose certain modifications on the manner in which promotions or qualifications for daily work are determined. Job seniority need not be the only standard for determining promotions. Orders requiring that job vacancies be filled by means other than normal routes of internal promotion have been upheld as necessary to remedy past discrimination, Gates v. Georgia-Pacific Corp., 492 F.2d 292 (9th Cir. 1974); cf. Allen v. City of Mobile, 331 F.Supp. 1134, 1142-43 (S.D.Ala.1971), aff'd. per curiam, 466 F.2d 122 (5th Cir. 1972), cert. denied, 412 U.S. 909, 93 S.Ct. 2292, 36 L.Ed.2d 975 (1973) (§ 1983 action), and, indeed, affirmative relief displacing whites with greater seniority has been granted, see United States v. Sheet Metal Workers International Assn., Local 36, 416 F.2d 123, 133-34 (8th Cir. 1969).
 
 
 28
 The provisions of the settlement agreement affecting Larkin thus cannot be characterized as illegal or unfair. Whatever disadvantages he may temporarily suffer in terms of daily work priority are offset by the substantial improvement in his long range prospects arising from the opportunity that has been created, for the first time, for him to reach Group I and, eventually, Regular Situation status. Judge Pierce therefore did not abuse his discretion in finding the settlement agreement to be fair to Larkin. The order is affirmed.
 
 FEINBERG, Circuit Judge (concurring):
 
 29
 I concur in the result.
 
 
 30
 This case involves the difficult issue whether a hiring quota based upon race can be legally imposed under the Civil Rights Act of 1964 or the United States Constitution. In the past few years, this court has twice held that such quotas may be utilized to correct past discriminatory practices in public employment. Vulcan Society v. Civil Service Comm'n, 490 F.2d 387 (2d Cir. 1973) (firemen); Bridgeport Guardians, Inc. v. Civil Service Comm'n, 482 F.2d 1333 (2d Cir. 1973), petition for cert. filed, 43 U.S.L.W. 3282 (U.S. Nov. 11, 1974) (policemen). We have also permitted such remedial quotas in two cases in which the employment was in the private sector of the economy. Rios v. Enterprise Ass'n Steamfitters, Local 638, 501 F.2d 622 (2d Cir. 1974); United States v. Wood, Wire & Metal Lathers, Local 46, 471 F.2d 408 (2d Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973).
 
 
 31
 Nevertheless, I believe a strong note of caution is called for and should be stated. In Rios, Judge Hays wrote a powerful dissent, arguing that section 703(j) of the Civil Rights Act, 42 U.S.C. § 2000e-2(j), bars the use of court-ordered racial hiring quotas.[1] He distinguished our decisions in Vulcan Society and Bridgeport Guardians on various grounds, the most persuasive of which was that "there was no other means of affording relief that did not interfere with essential public services" provided by firemen and policemen. 501 F.2d at 638. In both cases, hiring had to continue while new, non-discriminatory employment lists were drawn up. Judge Hays also distinguished Wood, Wire & Metal Lathers because the union there, in accepting a settlement, waived the benefit of section 703(j). A close analysis of the cases in our circuit thus suggests that Rios is the only decision squarely holding that a court may impose a racial quota in a private employment case in the absence of a settlement.
 
 
 32
 Emphasizing the status of the authority in this circuit on the issue is worthwhile because, as we have earlier pointed out, quotas should be approached "somewhat gingerly." Bridgeport Guardians, supra, 482 F.2d at 1340. The reason for this is clear. A racial quota is inherently obnoxious, no matter what the beneficent purpose. Such a quota is demeaning and divisive. At best it is a lesser evil. It is not to be encouraged.
 
 
 33
 However, this case is not an appropriate one for reexamination of the subject. The past discrimination against minority workers here was made quite clear after a four-week trial to the court. Minorities are conspicuously absent from the ranks of Group I and Regular Situation holders even though there are no special skills required to fill the jobs involved. The intervenor asks us to upset a settlement agreement that provides benefits for whites as well as for minorities. The quota the principal parties have agreed upon is intended to be of short duration. 384 F.Supp. at 590-91. And finally, the intervenor does not direct his main attack against the idea of a hiring quota; he objects to its size and the effect on him and others already in the industry in Group III status.
 
 
 34
 Under all of these circumstances, I concur in the result.
 
 
 
 [1]
 The term "minority" as used herein means persons who are Black, Spanish-surnamed, Oriental and American Indian. "White" or "non-minority" refers to all other persons
 
 
 [2]
 Intervenor in addition suggests procedural infirmities in the court's approval of a plan to which he objected. It is difficult to think of a way in which appellant was denied procedural rights, however, since Judge Pierce afforded him a hearing and thoroughly considered his objections
 
 
 [3]
 Intervenor also suggests that his rights under 42 U.S.C. § 2000e-2(j) have been violated. That section provides in pertinent part:
 "Nothing contained in this subchapter shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this subchapter to grant preferential treatment to any individual or to any group because of race, the color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area."
 It is well settled in this Circuit that this section does not preclude the use of racial hiring quotas to remedy the effects of past discrimination. Rios v. Enterprise Assn. Steamfitters, Local 638, supra, 501 F.2d at 630-31; Vulcan Society v. Civil Serv. Comm., 490 F.2d 387 (2d Cir. 1973); United States v. Wood, Wire & Metal Lathers, supra.
 
 
 [4]
 United States v. Roadway Express, Inc., 457 F.2d 854 (6th Cir. 1972), relied on by the intervenor, does not suggest otherwise. There the court was faced with a settlement agreement in which the union had agreed to give some benefits to white as well as minority non-union workers. When white union members objected, the court refused to invalidate the agreement. The case does not require that a settlement give equivalent benefits to minority and non-minority workers
 
 
 [1]
 Section 703(j) provides:
 Nothing contained in this subchapter shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area.