George **RIOS** et al.,
**Plaintiffs-Appellees,**

and

**John Gunther, et al., Applicants to Intervene-Appellants,**

v.

**ENTERPRISE ASSOCIATION STEAM-FITTERS LOCAL UNION # 638 OF U.A. et al., Defendants-Appellees.**

**UNITED STATES of America (EQUAL EMPLOYMENT OPPORTUNITY COMMISSION), Plaintiff-Appellee,**

and

**John Gunther et al., Applicants to Intervene-Appellants,**

v.

**ENTERPRISE ASSOCIATION STEAM-FITTERS LOCAL UNION # 638 OF U.A. et al., Defendants-Appellees.**

No. 534, Docket 74–2107.

United States Court of Appeals,
Second Circuit.

Argued May 1, 1975.

Decided June 24, 1975.

Burton H. Hall, New York City, for applicants to intervene-appellants.

Richard Brook, New York City (Delson & Gordon, New York City, of counsel), for defendant-appellee Enterprise Ass'n Steamfitters Local 638 of U.A.

Marilyn R. Walter, Atty., New York City (Dennis R. Yeager, New York City, of counsel), for plaintiffs-appellees George Rios, et al.

Steven J. Glassman, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., S. D. N. Y., Gerald A. Rosenberg, Asst. U. S. Atty., William A. Carey, Gen. Counsel, Joseph T. Eddins, Assoc. Gen. Counsel, Beatrice Rosenberg, Atty., E. E. O. C., of counsel), for plaintiff-appellee Equal Employment Opportunity Commission.

Before MOORE and MANSFIELD, Circuit Judges, and HOLDEN, District Judge.*

MANSFIELD, Circuit Judge:

The single issue presented for review is whether the applicants to intervene below, John Gunther, et al. ("Applicants" herein) were improperly denied post-judgment intervention as of right under Rule 24(a)(2), F.R.Civ.P.[1] Judge Bonsal of the Southern District of New York denied intervention on the ground of untimeliness.

We affirm, but on different grounds.

The history of this action goes back at least four years. In 1971 the federal government and private plaintiffs brought suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., alleging a pattern and practice of illegal discrimination by the Enterprise Association Steamfitters, Local 638

---

* Chief Judge of the United States District Court for the District of Vermont, sitting by designation.

1. Rule 24(a)(2), F.R.Civ.P., provides:

"Upon timely application anyone shall be permitted to intervene in an action: . . . (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."

("Union" herein) against non-whites. Lengthy pretrial proceedings and a full non-jury trial on the merits before Judge Bonsal resulted in a finding of illegal discrimination and an order prohibiting certain racially discriminatory practices and mandating affirmative action to increase non-white membership in the Union. *United States v. Enterprise Association Steamfitters, Local 638,* 360 F.Supp. 979 (S.D.N.Y.1973). The district court's findings of fact and conclusions of law were affirmed by us and the case remanded for recalculation of the percentage goal for non-white membership in the Union, which had been fixed at 30%. *Rios v. Enterprise Association Steamfitters, Local 638,* 501 F.2d 622 (2d Cir. 1974).

The application to intervene at issue here was filed in the district court on April 17, 1974, during the pendency of defendants' appeal from the district court's original order, which had issued in June 1973 on the basis of Judge Bonsal's findings and conclusions and which was amended in November 1973. The Applicants are seven white members of the Union. They sought to intervene to protect rights allegedly derived by them from the district court's order granting affirmative relief to the plaintiffs.

Applicants allege that they, like the non-white plaintiffs, are victims of discrimination by the Union. According to the papers submitted in support of their motion to intervene the Union is divided into two branches, the "A" Branch and the "B" Branch. The "A" Branch consists of construction steamfitters and the "B" Branch represents shop personnel, repairmen, and others who do steamfitting-related work. Although Applicants claim to do construction work full time and would thus be within the jurisdiction of the "A" Branch, they are members of the "B" Branch. However, under a Union permit system they and others in the same situation, while not members of the "A" Branch, are allowed to do "A" Branch work and receive "A" Branch pay and benefits. According to their allegations, certain similarly-situated persons, who are able to do "A" Branch work and for whom there are construction jobs, have been issued permits by the Union to enable them to do the work while remaining members of the "B" Branch, but have never been formally allowed to join the "A" Branch.

Applicants claim that under this system persons, including themselves, eligible for admission to the "A" Branch have been arbitrarily excluded from membership, not on the basis of their race, for the sole purpose of preserving the job security of the "A" Branch members. Apparently the Union's rules require that "A" Branch members be given first priority over such licensed "B" Branch permit holders for all "A" Branch construction work within the Union jurisdiction. Thus "A" Branch members must be hired before "B" Branch permit holders and laid off after them even though both are qualified to do the work. Furthermore, Applicants contend that "A" Branch members can bump "B" Branch permit holders from construction jobs if the "A" Branch members can find no other construction work. In sum, the Union has allegedly relegated "B" Branch permit holders to the position of cushioning "A" Branch members from the adverse effects of a fluctuating job market, and has arbitrarily excluded "B" Branch permit holders from "A" Branch membership.

The affirmative action plan ordered by the district court, see 360 F.Supp. 979 (S.D.N.Y.1973), and 501 F.2d 622 (2d Cir. 1974), provides *minimum annual goals* for non-white membership in the Union and an ultimate non-white goal, to be reached in 1977, approximately equal to the percentage of non-whites in the local labor force. The goals are to be met through a combination of apprentice training, direct admission, and other programs. An Administrator has been appointed under the plan to oversee the implementation of the various admission procedures and generally to insure that the affirmative action plan succeeds.

The only relevant portion of the plan for present purposes is the procedure for

direct admission to the "A" Branch. Under this provision, an applicant for membership in the Union who meets the enumerated requirements and who passes a court-approved practical examination "shall be admitted" to the "A" Branch.[2] The Union is required to give applications for admission to all who request them and to administer the examination as often as necessary to test all applicants. Applicants to intervene claim that this provision of the plan gives all persons, whites and non-whites, the right to admission into the "A" Branch on a non-discriminatory basis once the qualifications are met. They further allege that they have been denied this right by the Union and seek to intervene to enforce and protect it from infringement by the Union and others.

## DISCUSSION

This application is governed by Rule 24(a)(2), which authorizes intervention as a matter of right only if the applicants for intervention can demonstrate (1) "an interest relating to the property or transaction which is the subject of the action," (2) that they are situated so that "as a practical matter" the disposition of the action may "impair or impede" their ability to protect that interest, and (3) that their interest may not be "adequately represented by existing parties." The district court is entitled to the full range of reasonable discretion in determining whether these requirements have been met. See, e. g., *Chance v. Board of Education of the City of New York*, 496 F.2d 820, 826 (2d Cir. 1974).

The issue on this appeal centers principally around the first of the foregoing three criteria. Applicants claim no rights under Title VII, which forms the basis of the action instituted by the non-white plaintiffs. Nor do Applicants contend that they have been adversely affected or their job opportunities curtailed as a result of the district court's order establishing the affirmative action plan. See, e. g., *Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967), where petitioners might have been adversely affected by a merger. Indeed, Applicants concede "that they have been denied membership in the A Branch for many years prior to the institution of the Title VII actions" (Appellants' Brief 21), thus confirming that their exclusion from the "A" Branch is independent and unrelated to the present action which is based on racial discrimination. Cf. *Horton v. Lawrence County Board of Education*, 425 F.2d 735 (5th Cir. 1970). This case cannot, therefore, be compared to *Patterson v. Newspaper and Mail Deliverers' Union*, 514 F.2d 767, at 769 (2d Cir. 1975). We are not here dealing, for instance, with a claim that Applicants are the victims of reverse discrimination caused by the court's order.[3]

---

2. The affirmative action plan provides in pertinent part:

"B. *Direct Admission to the A Branch*

"15. All admissions into the Union shall be on the same basis, regardless of race, color, or national origin, and the procedures hereinafter set forth in this Section B are for the purpose of achieving the goals hereinbefore set forth in paragraph 3 [non-white percentage hiring goals].

"16. Applicants shall be admitted as full journeyman members of the A Branch if they meet the following conditions:

"(a) are residents of New York City or Nassau or Suffolk counties at the time of application, or such adjoining areas as may be approved by the Administrator;

"(b) have not been convicted of a job-related crime within five years of the date of application;

"(c) have had four years' experience, including experience obtained in the United States or elsewhere, in the Union's B Branch, or in construction or maintenance plumbing, pipe fitting or welding or other employment reasonably related or similar to steamfitting work, including experience in the Armed Forces and vocational training related to the skills of a journeyman steamfitter;

"(d) have successfully completed a Court Approved Practical Examination administered by a Board of Examiners as hereinafter provided in paragraph 19."

3. Indeed, intervention based upon such an interest at this stage of the litigation, long after affirmative relief has been fashioned and approved upon appeal, would be vulnerable to attack on grounds of untimeliness. E. g., *Har-*

On the contrary, Applicants seek to intervene on the ground that the district court's decree created new substantive rights in their favor, which did not exist before. This contention is based on the theory that "the property or transaction which is the subject of the action" is the whole process of admitting new members to the full "A" Branch. Applicants claim a substantial legal interest in this "property" by virtue of rights to non-discriminatory admission allegedly created by the order's affirmative relief provisions. With this theory we must disagree.

▆ The "property or transaction which is the subject of the action" has at all times been the Union's duty under Title VII not to discriminate against non-whites in the admission of new members. The purpose of this action, which was instituted by non-whites, is to enforce that duty, not to create rights in persons other than the original non-white plaintiffs. Title VII outlaws only discrimination based upon certain characteristics, including race, creed, color, sex and national origin.[4] It does not create rights in persons who are not the victims of discrimination prohibited by the statute. See *Patterson v. Newspaper and Mail Deliverers' Union, supra,* 514 F.2d at 772. With the scope of Title VII thus limited, it is doubtful that a federal district court has the power, in an action to remedy racial discrimination under that statute, to grant relief to employees who are not the victims of Title VII discrimination. See *United States v. Bethlehem Steel Corp.,* 446 F.2d 652, 665–66 (2d Cir. 1971).

Viewed in its entire context the district court's order was not intended to create new rights in favor of white employees but to protect non-whites against discrimination and to remedy the effects of such past discrimination by providing non-whites with an opportunity equal to that of the whites to join the "A" Branch. Standards were accordingly established to insure that whites and non-whites would be admitted on an equal basis. The purpose was not to promote or facilitate the admission of whites but on the contrary to prohibit their admission if they failed to meet these standards. Thus the court eliminated the past practice of admitting whites on an informal basis while excluding non-whites on sham grounds.

Under the plan approved by the court, although the Union is obligated to limit admission of white applicants in deference to non-whites in order to achieve the specified hiring goals, the Union remains free to limit admissions to the "A" Branch because of lack of job openings. The final paragraph of the direct-admission section of the plan confirms this interpretation:

> "26. The procedures set forth in paragraphs 15–24 above shall in no way preclude the admission of reasonable numbers of skilled whites to the Union's A Branch. To ensure the achievement of the minimum annual [hiring] goals set forth in paragraph 3 above, the Union with the approval of the Administrator may, if there are too many qualified applicants in relation to the available work, limit and fix temporary ratios (white and non-white) for the admission of new members to the A Branch."

*per v. Kloster,* 486 F.2d 1134, 1137 (4th Cir. 1973); *United States v. Carroll County Board of Education,* 427 F.2d 141 (5th Cir. 1970). Such an attempt to relitigate or reopen questions already decided may constitute a substantial interference with the orderly processes of the court.

4. The rather narrow scope of Title VII was surely understood and intended by Congress when it was enacted. An amendment proposed by Rep. Cahill of New Jersey which would have made it an unlawful employment practice to exclude persons from union membership on any basis was explicitly rejected in committee. The remarks of the Congressmen in opposition to the amendment indicate that such broad reform was just not the purpose of Title VII. See 110 Cong.Rec. 2593–95 (1964). We should not now create rights through construction which Congress has explicitly refused to create through legislation. Cf. *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 585–86, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

Clearly then, the plan does not *require* the admission of all persons who meet the court-established qualifications. The Union is still allowed to limit the admission of persons on grounds of lack of work for new members, although preference must be given to non-whites in order to meet the plan's goals and the Administrator must approve the practice.

█ Applicants, therefore, have no "significantly protectable interest" in the litigation, see *Donaldson v. United States*, 400 U.S. 517, 531, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971), and cannot meet the interest requirement of Rule 24(a)(2). Cases cited by Applicants do not point to a contrary conclusion. *Trbovich v. United Mine Workers*, 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972), allowed intervention by a union member under Rule 24(a) in an action brought by the Secretary of Labor to set aside an election of union officers even though the statute under which suit was brought, 29 U.S.C. § 482(b), did not authorize an action by individuals. The Court allowed intervention as being in furtherance of the objective of protecting unions from a myriad of unmeritorious individual lawsuits and lawsuits brought in different forums at different times, all arising out of the same election. Moreover, the intervenor was a member of the class which the statute was designed to benefit, had instigated the litigation through his own complaints and sought only to intervene to advance further arguments and introduce more evidence in support of the action. In contrast, Applicants here are essentially strangers to Title VII and to the aims of this lawsuit and, if not adverse, are at least in a neutral position with regard to the goals of Title VII. Their intervention cannot be supported by the rationale of *Trbovich*.

Other cases cited by Applicants, notably *Cascade Natural Gas Corp. v. El Paso Natural Gas Co., supra; Johnson v. San Francisco Unified School District*, 500 F.2d 349 (9th Cir. 1974); *Smuck v. Hobson*, 132 U.S.App.D.C. 372, 408 F.2d 175 (1969); *Nuesse v. Camp*, 128 U.S. App.D.C. 172, 385 F.2d 694 (1967), are equally of no avail. All of these cases hold that something less than "a specific legal or equitable interest in the chose" is sufficient to satisfy the interest requirement of Rule 24(a)(2). Rather, all persons who will be significantly affected by the outcome of the litigation (whether or not they could have been made parties at the outset) should, under this reasoning, be allowed to intervene to protect their interests. Even under this liberal interpretation of Rule 24(a)(2), however, Applicants have no case. The only interest they assert is based upon their claim that they have derived a right to admission to the "A" Branch from the affirmative relief granted to the plaintiffs. Since we have determined that Applicants were not intended to, and do not, have any new rights to admission by virtue of the provisions of the Plan, their asserted interest disappears. Their admission to the "A" Branch is unaffected by the affirmative relief except that they cannot now be admitted unless they meet the court mandated standards.

Aside from Applicants' failure to demonstrate a protectable interest relating to the property or transaction that is the subject of the action, they have also failed to show that their ability to assert their claims, which predate the present action and are not based on Title VII, has been impaired or impeded by denial of intervention. There is no showing that the Administrator, who as the agent of the district court is responsible for administration of the plan, would refuse to respect and enforce any rights Applicants have under the court's order. To the extent that they assert rights under the Landrum-Griffin Act (Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401 *et seq.*), the Taft-Hartley Act (National Labor Relations Act, 29 U.S.C. § 141 *et seq.*), or for violation by the Union of its duty of fair representation, see, e. g., *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), their application for intervention must be denied for the reason that nothing prevents their obtaining vindication of these rights by way of an

independent action, see *SEC v. Everest Management Corp.,* 475 F.2d 1236, 1239 (2d Cir. 1972). We are not dealing here with employees who seek merely to be heard on the subject of the Union's interpretation of and adherence to the terms of the plan but with applicants who seek to use the plan as a vehicle for asserting rights which, assuming they exist, would be grounded elsewhere. To permit the assertion of such claims in the present case, long after judgment, would only serve to disrupt the litigation, promote confusion and impose an excessive burden on the Union, which is already committed by the district court's order to detailed reporting and record keeping with respect to the membership and hiring of white and non-white employees.

We conclude then that the district court did not abuse its discretion in denying intervention as of right under Rule 24(a)(2). We base our result on a different rationale, however, and do not decide the question of whether the application for intervention was dismissible as untimely.

Affirmed.