See also 772 F.Supp. 1439.

**John E. PATTERSON, et al., Plaintiffs,**

**v.**

**NEWSPAPER AND MAIL DELIVERERS' UNION OF NEW YORK AND VICINITY, et al., Defendants.**

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

**v.**

**NEWSPAPER AND MAIL DELIVERERS' UNION OF NEW YORK AND VICINITY, et al., Defendants.**

**In the Matter of the Group III List of THE NEW YORK TIMES, pursuant to the terms of the Settlement Agreement, U.S.D.C., S.D.N.Y.**

**73 Civ. 3058 (WCC), 73 Civ. 4278 (WCC). Claim No. 186.**

United States District Court, S.D. New York.

Sept. 25, 1991.

834

William S. Ellis, Interim Admin'r, Marshall E. Lippman, P.C. (Marshall E. Lippman, of counsel), New York City, for Newspaper and Mail Deliverers' Union of New York City and Vicinity.

Grotta, Glassman & Hoffman, P.A. (Jedd Mendelson, of counsel), New York City, for The New York Times.

Penda D. Hair, Washington, D.C., Julius LeVonne Chambers, Charles Stephen Ralston, Ronald L. Ellis, Eric Schnapper, New York City, for plaintiffs.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

A class of private plaintiffs and the Equal Employment Opportunity Commission ("EEOC") brought two civil rights actions in 1973 against the Newspaper and Mail Deliverers' Union of New York and Vicinity ("NMDU" or "Union") and more than fifty news publishers and distributors within the Union's jurisdiction. Both suits charged that the Union, with the acquiescence of the publishers and distributors, had historically discriminated against minorities, and that the structure of the collective bargaining agreement, combined with nepotism and cronyism, had perpetuated the effects of past discrimination in violation of Title VII of the Civil Rights Act of 1964. Each lawsuit sought an affirmative action program designed to achieve for minorities the status they would have had in the newspaper delivery industry but for the alleged discriminatory practices.

On September 19, 1974, then-District Judge Lawrence W. Pierce issued an opinion and order approving a settlement between the parties and incorporating the Settlement Agreement in a Consent Decree, familiarity with which is presumed. See Patterson v. Newspaper and Mail Deliverers' Union, 384 F.Supp. 585 (S.D.N.Y.1974) aff'd, 514 F.2d 767 (2d Cir.

1975), cert. denied, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976). The Settlement Agreement implements an affirmative action program which modifies the hiring procedures for newspaper deliverers under the industry-wide collective bargaining agreement. Under the consent decree, each employer maintains a work force of regular situation holders for its minimum delivery needs. To accommodate fluctuations in circulation, the publishers are permitted to supplement their work force with daily shapers.

The daily shapers are divided into three groups with descending hiring priorities. Those shapers on the Group I list have first priority, after the regular situation holders, in order of their shop seniority. The next priority belongs to Group II shapers. Group II consists of all persons holding regular situations or Group I positions with other employers in the industry. The last priority belongs to Group III shapers.

The Settlement Agreement also established an Administrator, appointed by the Court, to implement the provisions of the Consent Decree and to supervise its performance. The Settlement Agreement authorizes the Administrator to hear claims concerning violations of the Consent Decree. Appeals from his decisions are heard in this Court.

Pursuant to the Settlement Agreement, plaintiffs seek review of a determination by Administrator William S. Ellis, Esq. (the "Administrator"), denominated "Claim 186." I have reviewed the exhibits and testimony relied upon by the Administrator, as well as the arguments submitted to the Court by the various parties. For the reasons set forth below, the Administrator's decision is affirmed.

## BACKGROUND

In the Spring of 1984, in the belief that the goal of 25% minority employment in the industry had been reached, the Union and most of the defendant employers moved to vacate the Consent Decree in its entirety, or in the alternative, to modify the decree to eliminate the affirmative action provi-

sions. During the period that followed the making of these motions, the matter of Claim 186 arose. The New York Times ("Times") and the Union wished to expand the Group III list to approximately 160 employees and to avoid the 3/2 ratio required by paragraph 15 of the Settlement Agreement.

In February 1985, the Times and the NMDU approached the Administrator to seek his authorization to permit the issuance of a Group III list which would not conform to the 3/2 ratio. The Administrator declined to agree to such a modification, informing the parties that for such authorization to be given, it would have to be with the consent of all the parties to the Consent Decree, and with the approval of the court.

The Administrator issued an order on August 13, 1985 that such a list should not be issued. Although the Settlement Agreement establishes a procedure for the appeal of Orders of the Administrator, the defendants did not appeal the Administrator's order freezing the Times' Group III list. *See* Settlement Agreement at ¶ 4. In direct contravention of both the Settlement Agreement and the Administrator's Order, the Adjustment Board of the Times and the Union proceeded to issue a new Group III list of approximately 175 names effective August 15, 1985.[1] A minority person was placed into every fourth position on the new list. Prior to the issuance of the Preliminary Group III list, the Group III list of the Times had rarely been greater than 40 employees.[2]

On August 20, 1985, the Administrator directed the Times and the NMDU not to use this Preliminary Group III list. The NAACP Legal Defense Fund ("LDF") and the EEOC objected to the list. A hearing before the Administrator was scheduled for August 26, 1985 to consider the objections

raised by the LDF. At that hearing, after all sides were afforded a full opportunity to be heard, the Administrator directed that (1) a notice should be attached to the Preliminary Group III list emphasizing that it was temporary and subject to the hearing to be held before the Administrator and (2) the Adjustment Board hear the complaints of certain individuals, adding such names as appropriate to the bottom of the list. The Administrator also ordered that the list comprise 30% minority persons. Finally, the Administrator ruled that so long as the persons on the list were qualified as provided in the Adjustment Board's conditions to the list, the Times could hire them from the list while the litigation proceeded. Transcript 114–115, 120.

It was the understanding of all parties that this proceeding would be resolved in two or three weeks and that a new list would be issued with the approval of the Administrator. The hearing started in October 1985, and it was not completed until approximately 6000 pages of transcript later, in July 1988.

## The Administrator's Findings

At the hearings the parties presented extensive evidence concerning the formation of the Preliminary Group III list. Based on the evidence presented in the case the Administrator concluded that both the Times and the NMDU had violated the following provisions of the Settlement Agreement:

1. Paragraph 15, dealing with the 3/2 ratio required of the Group III list.[3]

The Administrator found that in light of his refusal to modify the Settlement Agreement in order to permit less than the 3/2 ratio, the Times and the NMDU were obligated to follow paragraph 15 or, in the alternative, to seek recourse to this Court

---

**1.** The Adjustment Board is provided for in the collective bargaining agreement. It is composed of two Times and two NMDU representatives.

**2.** At the time that the Preliminary Group III list was issued in August 1985, the Times had reached a minority employment percentage of 30.14%. The industry-wide figure was 24.41%.

**3.** This term means that for every five employees added to the Group III list, three were to be minorities and two were to be non-minorities.

Paragraph 15 provides in relevant part:
Defendant employers shall offer positions available ... on the basis of three (3) minority employees for every two (2) other employees.

for the purpose of obtaining authorization for such modification. In the face of no such authorization, the Administrator concluded that the Adjustment Board had violated paragraph 15 of the Settlement Agreement when it issued the Preliminary Group III list.

2. Paragraph 15, dealing with the standards to be followed in giving preferences to certain employees to be placed on a Group III list.

The Administrator found that the evidence indicated that the primary basis for placing and positioning persons on the Preliminary Group III list was determined by the seniority of one's sponsor at the Times. If the sponsor, who was usually the father or some other relative of the applicant, had seniority at the Times, the position of the applicant was determined by reference to such sponsor's seniority. Although the Times attempted to prove that there were other criteria such as (a) shifts worked, (b) tractor-trailer driving ability, and (c) commitment and interest, which were taken into account in determining the placement of an applicant on the proposed Group III list, the Administrator found that such other criteria played but a minor role in the decision. The Administrator found that "[s]ponsorship became the factor which determined the weight to be given to other factors." Administrator's Determination in Claim 186 dated February 27, 1991 ("Administrator's Determination") at 47. Based on the evidence before him the Administrator concluded that the Times and the Union had discriminated in violation of paragraph 15 of the Settlement Agreement.

3. Paragraph 29, dealing with the establishment of a system for the submission of applications.

The testimony given before the Administrator indicated to him that the method by which an applicant applied for placement on the Preliminary Group III list was to give a slip of paper with the name and social security number of the applicant to a foreman or a union official.[4] These slips of paper were collected and treated by the Adjustment Board as applications for Group III. The testimony of various officials who handled these "applications" indicated that at times no one was sure who was keeping them or where they were being kept. This method of submitting applications for placement on Group III is not set forth in any official document of either the Times or the NMDU or in the Settlement Agreement.

The Administrator found that minority persons were not usually told about this method of submitting applications. In the instances in which they were told, the Administrator found that they were often given incorrect information.

In addition, a formal application was available in the lobby of the Times' building. Several minority claimants were found to have filled out such applications. The Administrator found, however, nothing in the testimony to suggest that the Times ever looked at these applications. Though the policy of the Times required that these formal applications be submitted to the Delivery Department for consideration, the Administrator found that these applications were not reviewed by the Delivery Department prior to making the new Group III list.

4. Paragraphs 1 and 2, in reference to discriminatory treatment in the offlist hiring of minority employees and in the various practices of the industry.

The language of paragraphs 1 and 2 of the Settlement Agreement provides that the defendants are prohibited from discrimination in purpose and effect. Under the terms of the Settlement Agreement all activity on the regular situation list, the Group I list, and the Group III list is regulated. Parties to the Settlement Agreement have no discretion to act except pursuant to its terms. In contrast to its proce-

---

**4.** If any Times' employee submitted a slip of paper on behalf of another person he became known as a sponsor.

dure for hiring of individuals on the Group I, II and III lists, the Times had no policies or procedures to govern selection of offlist workers but for the general prohibitions of the Settlement Decree.

Based upon the evidence presented, the Administrator found that each of the claimants proved an individual claim of racial discrimination in violation of paragraphs 1 and 2 of the Settlement Agreement with regard to offlist hiring.[5]

Moreover, the Administrator concluded that since the new Group III list took into account various hiring records which had been developed during offlist hiring, the discriminatory hiring affected the composition and order of the new Group III list. The Administrator found that the evidence supported eighteen individual claims of intentional discrimination with regard to exclusion from or low placement on the Group III list.

Three non-minority non-union intervenors, Richard M. Johnson, Richard W. Johnson, and Donald Schley alleged that the Times and the NMDU had violated paragraphs 15 and 29 of the Settlement Agreement and that such alleged violations had an adverse affect on them. The Administrator dismissed their claims for lack of standing.

*Remedies*

In light of his findings of fact and conclusions of law the Administrator prepared a Group I list on a one-to-one basis, consisting of 48 minorities and 48 non-minorities and a Group III list as of September, 1985.[6] The Administrator also awarded back pay to those claimants whom he found to have proved individual claims of discrimination with regard to the creation of the Preliminary Group III list. The back pay award covered the period from the date of the issuance of the Preliminary Group III list to November 30, 1988, the date on which the Interim Group I list was issued.[7]

As discussed above, the Administrator found that defendants engaged in intentional racial discrimination against all of the claimants in offlist hiring. The Administrator further concluded that "each [of the claimants] is entitled to an appropriate remedy for the [offlist hiring] violation." Administrator's Determination at 57. The Administrator failed to state explicitly what type of remedy should be imposed for this violation.

Finally, the Administrator ruled that the LDF was entitled to Attorneys' Fees.

## DISCUSSION

■ The Agreement provides the Administrator with broad authority to take all actions he deems necessary to implement the provisions and to ensure the performance of the Order. It further provides that the Administrator shall hear and determine a wide variety of claims arising under the Agreement, which may then be brought before the Court for review. Agreement ¶ 4.

In *Foreman v. Wood, Wire & Metal Lathers International Union, Local No. 46*, 557 F.2d 988, 992 (2d Cir.1977), the Court of Appeals for the Second Circuit noted that the scope of review of an independent administrator appointed to ensure compliance with a settlement decree was similar to that applied to an arbitrator's decision. More recently in *United States*

---

**5.** The Administrator concluded that the plaintiffs failed to prove that there was a pattern and practice of intentional discrimination and that the new list had an adverse impact. Administrator's Determination at 59.

**6.** In the fall of 1988, the Administrator applied to the court for permission to issue an Interim Group I list due to delays in the resolution of Claim 186. The court granted the application by an order dated November 30, 1988 in Claim 229. An Interim Group I list was issued soon thereafter.

In February 1990, the Interim Administrator issued his decision in Claim 186. Pursuant to his February 1990 decision, the Administrator reviewed the Interim Group I list and issued a revised list on March 16, 1990. The Court approved the revisions and an amended Interim Group I list was issued in March 1990.

Neither the Times nor the LDF challenge the composition of the present Group I list or the relative placement of personnel on it.

**7.** Back pay was to include benefits, vacation pay, pension contributions, and interest on any back pay award.

*v. International Brotherhood of Teamsters, etc.,* 905 F.2d 610, 616 (2d Cir.1990), the Second Circuit Court reiterated that an administrator's decision is "entitled to great deference." Thus, it is clear that an administrator's decision cannot be rejected merely because a court may be inclined to reach a different result.

■ The Times places great emphasis on its position as "the pacesetter in the industry in affording bargaining unit employment opportunities to minorities." Times Brief at 13. Both the Times and the NMDU argue that the Adjustment Board issued the Preliminary Group III list at a time when it appeared that departure from the 3:2 ratio was permissible if not required. Relying on the fact that the Times Delivery Department work force was approximately 30% minority, the Times and the Union argue that "there was strong reason for believing it was unlawful to continue following the 3:2 ratio" in light of the Supreme Court decision in *Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984) (ruling that affirmative action quotas were not without limitation). Times Brief at 18.

This Court is cognizant of the Times record but notes, nevertheless, that the Times and the NMDU took matters into their own hands in open disregard of the plain language of the Settlement Agreement and the explicit order of the Administrator. This they cannot do. A court order must be obeyed. This Court hereby affirms the Administrator's conclusion that the Times and the Union's unilateral noncompliance with the 3/2 ratio set out in Paragraph 15 constitutes a violation of the Consent Decree. Because the Court affirms the Administrator's finding of a violation of Paragraph 15 on this ground, it does not reach the question whether consideration of sponsorship "as the factor which determined the weight to be given to other factors" violated the preference requirements of paragraph 15 of the Settlement Agreement.

Paragraph 29 provides in pertinent part: Applicants for employment with any defendant employer shall report to such office during normal business hours to complete applications for listing on the extra lists at a particular employer, and such applications shall be available only at such office or offices. The Administrator shall receive a monthly report concerning said applicants.

The Administrator interpreted this paragraph as an attempt to "establish a system for the filing of applications which set forth qualifications of the applicant, in a central place available to all, with procedures which afforded an equal opportunity to all interested persons, and which required on a standardized form a request for the type of information that an employer interested in truck drivers and deliverers would need." Administrator's Determination at 48. The Administrator found, on the basis of the evidence presented before him, that the application procedures for the Preliminary Group III list violated Paragraph 29 the Settlement Agreement. This Court finds no basis for reversal of such finding.

Both the Times and the NMDU argue that the selection of off-list hires was not founded on racial considerations but, rather, on the bona fide judgment of foremen regarding past performance and/or expected reliability of drivers. The Administrator rejected these arguments, finding them "pretextual and not credible." Administrator's Determination at 55. The Administrator further concluded that, with regard to eighteen of the claimants, the defendants did not offer credible reasons for their relative placement on or exclusion from the Preliminary Group III list. The Administrator found further that defendants failed to sustain their burden of articulating nondiscriminatory reasons for their adverse treatment of the claimants.

This Court, upon consideration of the record and the briefs submitted, finds no basis for concluding that the Administrator's decision was arbitrary or for substituting its judgment for that of the Administrator. This Court recognizes that the Administrator's hearing on Claim 186 covered a period of three-and-a-half years and that approximately 6,000 pages of testimo-

ny were taken. He has rendered a reasoned decision that is clearly within the scope of the authority given to him by the Settlement Agreement. It is obvious that he did not act hastily or without having access to all of the relevant facts. While it may be argued that these findings do not represent the only set of conclusions which the evidence might have supported, I find them to be reasonable and not capricious, arbitrary, or manifestly unfair and therefore affirm that portion of the Administrator's Determination finding intentional discrimination against all claimants in offlist hiring and against eighteen claimants in the creation of the Preliminary Group III list.[8]

*The Case presented by the Non–Minority Intervenors.*

■ The Administrator concluded that the three non-minorities who sought to intervene in this action—R.M. Johnson, R.W. Johnson, and Donald Schley—lacked standing to do so. The Administrator concluded that they lacked standing because (1) "they themselves [had] not suffered racial discrimination" and (2) "their relationship to minority persons ha[d] not been such that racial discrimination ha[d] affected them, directly or indirectly." Administrator's Determination at 62. The attempted intervenors do not dispute the finding that they themselves were not victims of racial discrimination. However, they do maintain that they have standing on the ground that the discrimination alleged has deprived them of desired interracial associations.

The Settlement Agreement was implemented to provide for the resolution of "all complaints that any individual in the bargaining units in the industry represented by the NMDU has been allegedly denied equal employment opportunities on the basis of race, color or national origin." Settlement Agreement at ¶ 4. The Court concludes that Johnson, Johnson and Schley have no standing to bring a claim asserting that the discriminatory actions of the Times and the NMDU adversely affected

their racial associations in the workplace. The Settlement Agreement was not designed to resolve such claims. Moreover, there is no record evidence to support their contention that they suffered reduced interaction with minorities as a result of the defendants' discriminatory conduct. Accordingly, the Court affirms the Administrator's determination that the non-minority intervenors lack standing to bring such a claim under the Settlement Agreement.

*Remedies*

As the Times notes, "the formation of these lists is not a simple task." Times Brief at 17. This Court concurs and finds that in crafting the Second Revised Interim Group I list in March 1990, the Administrator reconstructed as closely as possible the status that successful claimants would have held if the Settlement Agreement had not been violated and racial discrimination had not occurred. Those persons heretofore on the Second Revised Interim Group I list at the Times shall be considered hereafter members of Group I. The Union is directed to issue Union cards to all of the employees on Group I. The Union is directed to give priority numbers to the first one-fourth of the Group I list as if they had been inducted on September 1, 1986, to the second fourth of the Group I list as if they had been inducted on September 1, 1987, and to the second half of the Group I list as if they had been inducted on September 1, 1988.

■ The Times argues that any monetary relief is neither required nor appropriate even assuming, *arguendo*, that violations of the Settlement Agreement were committed, because no back pay award is cognizable under the Settlement Agreement. While Paragraph 37 established a back pay fund in connection with the settlement of the *Patterson* action, nowhere in the Settlement Agreement is there an affirmative statement ordering back pay for violations of the Settlement Agreement. The Times argues that "[p]lainly the parties to the Settlement Agreement knew

---

**8.** This Court does not reach the question of whether the Administrator ruled correctly in concluding that the evidence did not support a finding of a pattern and practice of intentional discrimination or of adverse impact.

how to indicate that back pay could be ordered" as a general remedy had such been their intention. Times Brief at 107. The Times argues that the absence of an affirmative statement to that effect is most telling.

It is clear that the parties to the Settlement Agreement intended the Consent Decree to subsume alleged violations of Title VII.[9] This is borne out by the language of the Settlement Agreement providing:

> The Order resolves all issues between plaintiffs and defendants, who have agreed hereto, relating to alleged acts and practices of discrimination by said defendants to which the Order is directed, and with respect to such matters, compliance with the Order shall be deemed to be compliance with Title VII and shall be deemed to satisfy the requirement for affirmative action by said defendants of any of them. The doctrines of *res judicata* and collateral estoppel shall apply to all plaintiffs with respect to all issues of law and fact and matters of relief within the scope of the complaint or the Order.

Settlement Agreement at ¶ 42. This identification between the terms of the Settlement Agreement and the requirements of Title VII indicates the parties' intent that discrimination claims be remedied through the Consent Decree's specific enforcement procedures.

For the past sixteen years the Administrator has been hearing and determining claims brought by NMDU members regarding discriminatory treatment and denial of equal opportunity within the New York newspaper industry. The large majority of such claims have involved individuals who were not members of the private class of plaintiffs in 73 Civ. 3058.

Until a recent federal action filed by the LDF there have been, since the entry of the Final Order approving the Settlement Agreement, no lawsuits filed against any defendant alleging discrimination in the bargaining unit represented by the NMDU. Instead, allegations of discrimination have either been settled directly with claimants or presented to the Administrator.

During this sixteen-year period the EEOC and the New York State Division of Human Rights ("NYSDHR") have forwarded to the Administrator for his exclusive consideration almost all charges of discrimination filed by NMDU members with those agencies. On some occasions, such discrimination charges were not forwarded to the Administrator because the employers settled the complaints directly with the individuals involved, the EEOC and/or the NYSDHR without the need for the Administrator's intervention.

It is clear beyond question that the judicially approved and monitored Settlement Agreement expressly authorized the Administrator to adjudicate claims of discrimination. It has long been the position of this Court that if an individual seeks to remedy a wrong contemplated by the Consent Decree, that individual could apply to the Administrator for relief pursuant to the Consent Decree. Paragraph 42 provides that compliance with the Settlement Agreement is compliance with Title VII and accords a *res judicata* effect to the all issues of law and fact and matters of relief resolved by the Administrator.[10] Retroactive seniority and back pay are routinely awarded to victims of racial discrimination in violation of Title VII. The Settlement

---

9. The provisions of the Settlement Agreement do not indicate that plaintiffs *waived* their Title VII rights by agreeing to submit Title VII claims (of the type contemplated by the Consent Decree) to the Administrator. On the contrary, submission of such grievances is the functional equivalent of a plenary lawsuit, since compliance with the Consent Decree is tantamount to compliance with Title VI. Settlement Agreement ¶ 42. Moreover, appeals from the determinations of the Administrator are heard in this Court.

10. The Court expresses no view as to whether the Administrator's jurisdiction of discrimination claims within the scope of the Consent Decree is exclusive, although it is difficult to see how court rulings in Title VII actions brought by individual plaintiffs seeking more favored positions on the employment ladder could fail to interfere with the intricate and delicately balanced scheme of affirmative action established by the Decree.

Agreement cannot afford complainants fewer types of relief than are available through Title VII litigation. To hold otherwise would deprive complainants under the Settlement Agreement of the remedies available to them through Title VII litigation. Accordingly, this Court concludes that the Settlement Agreement, while not explicitly authorizing the Administrator to award back pay, does not proscribe the award of back pay.

The Times argues that back pay is unwarranted since the purpose of this proceeding was to resolve the competing claims of individuals for placement on the list and that as such, the action was in the nature of an interpleader suit, with the Times akin to a stakeholder. The Times argued that it was "disinterested" in the composition of the Preliminary Group III "so long as the personnel are competent and its staffing requirements are satisfied." Times Brief at 105. The Administrator rejected this argument. Even if the Group III positions were analogized to a stake of money or property, defendants' roles here are not those of stakeholders. Rather than turn the stake over to the Court or to the Administrator, defendants issued and applied the list in violation of both the judicial decree and the Administrator's explicit order. Even if the defendants request to the Administrator for permission to depart from the 3/2 ratio might be construed as analogous to an interpleader action, the interpleader rules do not allow the stakeholder to begin an interpleader action and then precipitously turn over the money or property to one claimant while the court is deciding how to rule on the interpleader.

The Supreme Court in *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 422, 95 S.Ct. 2362, 2373–74, 45 L.Ed.2d 280 (1975) set out the governing standard for the award of back pay:

> [B]ackpay should be denied only for reasons which, if applied generally, would not frustrate the statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination.

These "statutory purposes [leave] little room for the exercise of discretion not to order reimbursement." *Id.* at 417, 95 S.Ct. at 2371.

In this case, the Administrator, who heard all of the evidence and the defendants' arguments, determined that no exception applies and that back pay is an appropriate and necessary remedy for the eighteen claimants who prevailed on claims of intentional discrimination.

The Administrator's conclusion that back pay is an available remedy under the Settlement Agreement is affirmed. The Administrator is directed to hold evidentiary hearings to determine the amount of back pay due and owing to all of the claimants in Claim 186 but for McCargo, Harvey, Streety, and the three non-minority intervenors. The Administrator is further directed to hold an evidentiary hearing for the purpose of determining the relative liability of The Times and the NMDU.[11]

■ Title VII establishes a strong presumption in favor of an award of fees to the prevailing plaintiff. The court in *Albemarle, supra,* relied upon the "strong public interest in actions brought under Title VII to eradicate discriminatory practices" in holding that attorneys' fees should be awarded to successful plaintiffs "in all but very unusual circumstances." 422 U.S. at 415, 95 S.Ct. at 2370. The same right to attorneys' fees applies where, as here, plaintiffs prevail in a proceeding to enforce a settlement agreement. This Court af-

---

**11.** The Court affirms the Administrator's determination that the Times and the NMDU are jointly responsible for above-mentioned violations of the Settlement Agreement.

The Union interprets the Administrator's finding that the NMDU and the Times are jointly responsible as meaning that both parties are fifty percent responsible. The Court rejects the NMDU's interpretation. The Administrator is directed to hold an evidentiary hearing to determine the relative culpability of the parties so as to apportion properly liability for monetary compensation. While the Administrator may well conclude that the Times and the NMDU are equally responsible, such decision has not yet been made.

firms the Administrator's determination that attorneys' fees are recoverable under the Consent Decree and his award of attorneys' fees to the LDF in the instant case.

The Administrator has not recommended that the Times and the Union be held in contempt, finding that little purpose would be served at this time by such a recommendation. This Court concurs and denies the LDF's motion of January 21, 1991 asking the Court to refer the issue of defendants' criminal contempt to the United States Attorney for investigation and determination whether to prosecute.

### CONCLUSION

For the reasons stated herein the Court affirms the Administrator's Determination of February 27, 1990.

The Administrator is directed to hold evidentiary hearings to determine the amount of back pay due and owing to all of the claimants in Claim 186 but for McCargo, Harvey, Streety, and the three non-minority intervenors. The Administrator is further directed to hold an evidentiary hearing for the purpose of determining the relative liability of The Times and the NMDU.

The question of what relief is appropriate in light of the Administrator's finding of offlist hiring discrimination is remanded to the Administrator for a determination not inconsistent with the views expressed in this opinion.

The motion of the NAACP Legal Defense Fund requesting that this Court refer the question whether defendants should be prosecuted for criminal contempt to the United States Attorney is hereby denied.

SO ORDERED.